COMMONWEALTH *vs.* JOSEPH N. CALLAHAN.

Suffolk. April 6, 1982. — July 20, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Insanity. Constitutional Law,* Self-incrimination. *Practice, Criminal,* Psychiatric examination, Instructions to jury, Discovery. *Witness,* Expert.

Where a criminal defendant's inculpatory statements made in the course of a court ordered psychiatric examination were admitted in evidence at his subsequent trial for murder in the first degree, in violation of provisions of G. L. c. 233, § 23B, prohibiting admissions of defendant's statement during such an examination if the statement constitutes a "confession of guilt," reversal of the defendant's conviction was required, notwithstanding the possibility that the statements in question were mere admissions falling short of a full acknowledgment of guilt. [786-788]

The defendant at a criminal trial, in which the principal issue was his criminal responsibility, did not, by presenting expert testimony based in part on his interview with a psychiatrist, thereby waive the protections of G. L. c. 233, § 23B, and, in the circumstances, the admission in evidence of the defendant's inculpatory statements made in the course of a court ordered psychiatric examination was error requiring reversal of his conviction of murder in the first degree. [788-789]

Admission of a defendant's inculpatory statements, made in the course of a court ordered psychiatric examination, in evidence at his subsequent criminal trial in violation of G. L. c. 233, § 23B, was not harmless error, where the statements went beyond an admission of shooting the victim, which he acknowledged, and could also be viewed as strong evidence of premeditation and intent. [790]

At a criminal trial, where the defendant's principal challenge to the Commonwealth's expert witness was that the witness had been precipitous in diagnosing the defendant's mental condition, the judge may have invaded the province of the jury by pointing out, on his own initiative, the time limitations imposed by G. L. c. 123, § 15 (*b*), as an objective reason for the witness's alleged haste. [790-792]

At a murder trial in which the principal issue was the defendant's criminal responsibility, the defendant's expert witness should have been allowed to testify to his opinion on the relationship between suicide and homicide. [792]

In the circumstances it was not error to permit a police criminalist to testify at a criminal trial concerning his examination of certain items of real evidence which had been lost without fault of either party and which were thus unavailable for the jury's viewing or for defense counsel's inspection. [792-793]

INDICTMENT found and returned in the Superior Court on April 12, 1976.

After review by this court reported in 380 Mass. 821 (1980), the case was retried before *Brogna*, J.

*Nancy Gertner* for the defendant.

*Philip Beauchesne*, Assistant District Attorney (*Robert A. Marra, Jr.*, Legal Assistant to the District Attorney, with him) for the Commonwealth.

NOLAN, J.  The defendant was convicted of murder in the first degree on December 21, 1976.  After an appeal, we reversed the conviction, holding that the trial judge's instruction on malice was fatally defective.  *Commonwealth* v. *Callahan*, 380 Mass. 821 (1980).  Following the appointment of new counsel, a second trial commenced on June 18, 1981, and the defendant was again convicted of murder in the first degree.  He appeals, arguing that the judge erred in (1) admitting the defendant's statements made in the course of a court ordered psychiatric examination; (2) improperly limiting the defendant's expert testimony; (3) admitting the Commonwealth's expert testimony concerning physical evidence to which the defendant did not have access; (4) instructing the jury on the time limit of a defendant's commitment under G. L. c. 123, § 15 (*b*); and (5) erroneously instructing the jury on criminal responsibility. We reverse the defendant's conviction and order a new trial.

The defendant and the victim, Marion Judith Reichle, had been living together for some months.  About 1 A.M. on February 1, 1976, the police went to the house that the victim and the defendant shared in response to a radio report that a man had been shot in the street.  When they arrived at the house, they found the defendant standing in the doorway dressed only in an undershirt and pants.  A police officer

testified that the defendant led them upstairs to a bedroom where the victim was lying on the bed with blood on the back of her head. When asked what happened, the defendant responded that the victim was going to force him to leave, so he shot her. In the bedroom, the officers found a .25 automatic pistol wrapped in a towel. At the scene, the police recovered a number of liquor bottles, several glasses containing the remnants of liquor, a bartender's guide, and several pharmaceutical prescription bottles. A ballistician testified at trial that the slugs recovered from the victim were fired by the gun which was in the bedroom. The medical examiner testified that the victim died from gunshot wounds to her head.

1. *The inculpatory statements.* The defendant presented extensive medical evidence to show that he was not criminally responsible. Medical records were introduced covering a period of thirteen years showing a long history of mental illness. The records revealed repeated hospitalization for manic-depressive illness and schizophrenia. In addition, they showed that the defendant had attempted suicide several times. The defendant's chief expert, Dr. Harry L. Kozol, a specialist in neuropsychiatry, reviewed the medical records for the jury, noting the importance, in his opinion, of the suicide attempts and hospitalizations. He explained that he ordered that an electroencephalogram (EEG) be conducted on the defendant, and that the examination revealed an organic brain disorder known as temporal lobe disorder. He testified that that defect causes a person to behave as if sleepwalking; he appears to be conscious, but does not respond, and is unable to recall what happened while in that state. Dr. Kozol concluded that at the time of the shooting the defendant could not appreciate the criminality of his conduct nor conform his conduct to the requirements of the law. In reaching his conclusion Dr. Kozol took into account statements which the defendant made to him concerning the night of the shooting. The defendant also called two psychiatrists who treated him prior to the night of the shooting, and the doctor who conducted the EEG. The defendant did not take the stand.

In rebuttal, the Commonwealth offered the testimony of Dr. Stephen G. Cronin, who conducted court ordered examinations of the defendant at Bridgewater State Hospital in October, and November, 1976. Dr. Cronin described the defendant as tangential, very loose in his thought organization, and having extreme difficulty in focusing. Dr. Cronin determined that the defendant was incompetent to stand trial. He placed the defendant on lithium and concluded by his last interview with the defendant on November 17, 1976, that the defendant was competent to stand trial. Dr. Cronin testified that, although the defendant had a history of mental illness, he believed that the defendant was criminally responsible at the time of the shooting.

Prior to trial, the defendant moved to suppress certain statements which were made by the defendant during the court ordered psychiatric examination. The defendant challenged the admission of the statements on several grounds. He claimed that the statements violated the terms of G. L. c. 233, § 23B, and this court's decision in *Blaisdell* v. *Commonwealth,* 372 Mass. 753 (1977), that the statements were made in the absence of adequate warnings, and that the statements were made at a time when the defendant was unable to understand the warnings. The judge allowed Dr. Cronin to testify to the statements made to him by the defendant, apparently basing his decision on the fact that the defendant's expert relied in part on his interview with the defendant and on statements the defendant made during that interview. Dr. Cronin testified on direct examination that he concluded that the defendant was criminally responsible at the time of the shooting, in part because of the defendant's statements during the examination. When asked which statements indicated this to him, he replied, "I'd like to read a statement. He said he was being thrown, quote, the hell out of the house, was enraged, picked up the gun and shot her, with the thought beforehand that, 'shoot her, Callahan, and you're . . . you're going to jail for murder.'" The judge instructed the jury that they were not to consider the defendant's statements for their truth but only

as they pertained to the psychiatrist's opinion that the defendant was or was not criminally responsible at the time of the shooting. We conclude that the admission of the defendant's statements was reversible error.

The defendant contends that the admission of these statements violated G. L. c. 233, § 23B. General Laws c. 233, § 23B, as amended by St. 1970, c. 888, § 27, provides: "In the trial of an indictment or complaint for any crime, no statement made by a defendant therein subjected to psychiatric examination pursuant to [G. L. c. 123, §§ 15 or 16] for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged." It is clear that the defendant's statements constituted a confession of guilt and were inadmissible under the provisions of this statute. The statements allegedly made by the defendant not only admit that he shot the victim but also tend to show deliberate premeditation. They are precisely the type of statements that § 23B prohibits. The Commonwealth argues that the statements were admissible because they bore on the issue of the defendant's mental condition. While this may be true, § 23B prohibits the admission of statements bearing on a mental condition which constitute "a confession of guilt of the crime charged." The Commonwealth further argues that the statements were admissible under § 23B, because they did not constitute a confession, but rather were admissions. This argument cannot prevail. In *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 763 (1977), in our discussion of § 23B, we construed "the word 'confession' to include inculpatory statements constituting admissions short of a full acknowledgement of guilt." See also *Commonwealth* v. *Tavares*, 385 Mass. 140, 150 (1982).

The Commonwealth finally argues that the statements made to the Commonwealth's expert were admissible because the defendant presented expert testimony which was based, in part, on an interview with the defendant. The

Commonwealth relies on our decision in *Blaisdell* to claim that by offering expert testimony the defendant waived his privilege against self-incrimination, as well as the protections of § 23B. The Commonwealth misreads our decision in *Blaisdell*. In *Blaisdell*, we ruled that when a defendant notifies the Commonwealth that he intends to raise the issue of his criminal responsibility and to present the evidence of experts who have examined him, then he may be required to submit to a court ordered psychiatric examination. This is so because the defendant, by voluntarily proffering such evidence to the jury, has waived his privilege against self-incrimination to a limited extent. However, we did not hold that the defendant thereby waived his privilege against self-incrimination entirely. Indeed, we imposed stringent guidelines on the use of the fruits of the compelled interview. As part of these guidelines we stated: "(5) Court-appointed psychiatrists may testify as to their opinion based on the defendant's testimonial statements only if the defendant offers testimony based on his statements but nothing herein shall preclude expert testimony given on any other basis; (6) Government psychiatric testimony in any event shall be given in a manner consistent with the requirements of G. L. c. 233, § 23B." *Id.* at 769. Thus we specifically incorporated the safeguards required by § 23B. In *Commonwealth* v. *Goulet*, 374 Mass. 404, 411 n.4 (1978), we again made it clear that the waiver we found in *Blaisdell* was a limited waiver that could require a defendant to submit to a court ordered examination. We stated that "[t]his waiver is implied in the interest of giving the Commonwealth a fair chance to present countervailing psychiatric testimony; it is not to be understood as a complete relinquishment of the Fifth Amendment and art. 12 privilege which could allow pressure on the defendant to take the witness stand." *Id.* The statements admitted in evidence were clearly prohibited by § 23B, and the Commonwealth is in error in concluding that the *Blaisdell* case stands for the proposition that the defendant has waived the protections of § 23B by offering at trial the testimony of his psychiatrist, based upon an interview with the defendant.

The Commonwealth argues that even if the admission of the statements was error, it was harmless beyond a reasonable doubt because the defendant "never seriously questioned that he shot the victim." This argument overlooks the fact that the statements go beyond a mere admission of shooting the victim and could be viewed as strong evidence of premeditation and intent. The statements could well have affected the jury's decision on the degree of murder. In addition, although the defendant's expert testified to statements the defendant made to him concerning the night of the shooting, none of these statements was comparable to the statements to which Dr. Cronin testified. We cannot say that the admission of these statements was harmless error. Contrast *Commonwealth* v. *O'Connor*, 7 Mass. App. Ct. 314, 318 (1979).

Since we hold that the defendant's inculpatory statements to Dr. Cronin should have been suppressed under the mandate of § 23B, we do not reach the defendant's contention that they should have also been suppressed because he was inadequately informed of the fact that any statements he made in the court ordered examination might be used against him (*Commonwealth* v. *Lamb*, 365 Mass. 265 [1974]), or because the statements, which were made during the same examination in which the defendant was determined to be incompetent to stand trial, were not voluntarily made. It follows that we need not consider the judge's refusal, despite the defendant's request, to instruct the jury that they must decide whether the defendant's statements to Dr. Cronin were freely made.

2. *Other assignments of error.* a. We now address the remaining issues raised by the defendant which may recur at the new trial. The first concerns an instruction given by the judge concerning the time constraints imposed by G. L. c. 123, § 15 (*b*), on a defendant's commitment for psychiatric evaluation. During the trial, defense counsel attempted to show that the Commonwealth's expert, Dr. Cronin, was superficial and perfunctory in his examination of the defendant. An important part of the defense challenge

was the claim that Dr. Cronin had ordered a full battery of psychological tests while Callahan was institutionalized at Bridgewater, but that he issued his report without waiting for the results of the tests. During her closing argument, defense counsel attacked Dr. Cronin's competence, claiming that he had been precipitous in his evaluation of the defendant and had "rushed to judgment." In his instructions to the jury, the judge directly addressed this issue and stated in effect that Dr. Cronin was acting under the time constraints imposed by law.[1] The defendant objected to this instruction. The defendant argues that the instruction was wrong as a matter of law because, under the statute, the defendant could request an extension beyond the forty-day period and had in fact consented to an extension on a previous occasion. The defendant also argues that it was an improper comment directed at the heart of the defendant's challenge to Dr. Cronin, even using the same language ("rush to judgment") used by defense counsel in her closing argument, and that the judge thereby provided the jury with an objective reason why Dr. Cronin did not wait for the test results. Defense counsel correctly points out that there was no evidence in the record that Dr. Cronin was aware of the forty-day provision.

It is always open to a judge to instruct a jury on the applicable law. See G. L. c. 231, § 81. However, we are of the opinion that if the judge felt it necessary to refer to the statute, fairness to the defendant required him to explain fully its relevant portions and to point out that the defendant could have consented to an extension beyond the forty-day limit. Neither the Commonwealth nor the defendant had referred explicitly to the statute during trial. Dr.

[1] The judge's instruction was as follows: "While we're going over the cross-examination of the experts, I should mention because it was mentioned in argument by counsel for the defense, I think, when she said — she was talking about Dr. Cronin rushing to judgment, not having another, asking for another extension so that that battery of tests that he ordered could have been accomplished. The law is that no commitment can be extended more than forty days after the original commitment. You have the date of the commitment."

Cronin's testimony represented the Commonwealth's entire case on the defendant's criminal responsibility. The defendant's principal challenge to Dr. Cronin's testimony was that he had been precipitous in his diagnosis. By providing the jury with an objective reason for Dr. Cronin's alleged haste, absent evidence that Dr. Cronin was influenced by G. L. c. 123, § 15 (*b*), the judge may have improperly "invade[d] the province of the jury to decide what inferences to draw from certain evidence." *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980).

b. The defendant next contends that the judge improperly limited the testimony of the defendant's expert, Dr. Kozol. The judge refused to allow defense counsel to inquire into Dr. Kozol's opinion on the relationship between suicide and homicide, ruling that it was not relevant to the question of the defendant's criminal responsibility. We think Dr. Kozol should have been allowed to state his opinion on this issue. As we said in *Commonwealth* v. *McHoul*, 352 Mass. 544, 550 (1967), under our test for criminal responsiblity "experts will be unrestricted in stating all that is relevant to the defendant's mental illness. . . . [E]xperts experienced in the study and treatment of the mentally ill may testify fully as to the nature and extent of impairment of defendants' mental faculties as well as their observations or other bases for their conclusions."

c. At trial, a criminalist with the Boston police department, David L. Brody, testified as to his visual examination of some human hairs and the towel in which they were embedded which he collected from the scene. The items had been introduced in evidence at the first trial. Prior to the second trial, defense counsel's motion for further discovery of the physical exhibits was allowed. The clerk's office, however, was unable to locate them. Defense counsel moved that the Commonwealth be barred from offering any expert testimony concerning these items since defense counsel at this trial did not have an opportunity to inspect and test the items. The judge overruled the objection and permitted Brody to testify concerning them. The defendant alleges that this was error.

Brody testified that there were three irregular holes in the towel consistent with firearm discharge. He did not perform any tests on the towel or the hairs. The judge instructed the jury that the items had been lost without the fault of either party and that, therefore, the items were unavailable for either their viewing or for defense counsel's inspection. Defense counsel was given Brody's file on the evidence and cross-examined him. The lost evidence was available to the defense during the first trial, but apparently no attempt was made to examine it at that time. In the circumstances, we do not think that it was error for the judge to allow Brody to testify concerning the items. A different issue would be presented if the items had been lost due to some fault on the part of the prosecution, or if the prosecution had failed to produce exculpatory evidence in its possession. See generally *Commonwealth* v. *Redding,* 382 Mass. 154, 155-156 (1980), and cases cited therein.

d. Finally, the defendant claims error in the jury instructions on criminal responsibility, contending that the judge did not properly state the *McHoul* test. The defendant objected to the judge's charge. Since we reverse the conviction we need not decide this issue but only say that the charge on criminal responsibility must comport with the standard in *McHoul.* See *Commonwealth* v. *Goulet,* 374 Mass. 404, 414-416 (1978).

The judgment is reversed, the verdict set aside and the case is remanded to the Superior Court for a new trial.

*So ordered.*