COMMONWEALTH *vs.* ARTHUR R. MARTIN.

Berkshire.  January 9, 1984. — April 10, 1984.

Present: GREANEY, C.J., GRANT, & ARMSTRONG, JJ.

*Homicide. Insanity. Practice, Criminal,* Psychiatric examination. *Constitutional Law,* Self-incrimination.

At the trial of indictments for murder and for unlawfully carrying a firearm, as to which the defendant had interposed a claim of insanity, it was error to admit in evidence certain inculpatory statements he had made during a court-ordered psychiatric examination, where the defendant himself had not first placed the statements in evidence either through his own testimony or through the testimony of his expert witness. [723-725]

Failure of defense counsel at a criminal trial to object to the improper admission of testimony concerning inculpatory statements made by the defendant during a court-ordered psychiatric examination did not preclude reversal of the defendant's convictions where the improperly admitted testimony had the effect of seriously weakening his defense of insanity. [725]

INDICTMENTS found and returned in the Superior Court Department on March 2, 1981.

The cases were tried before *Urbano,* J.

*John M. Thompson* for the defendant.

*Lee Diane Flournoy,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J.  After a Superior Court jury trial the defendant, Arthur R. Martin, was convicted of murder in the second degree (on an indictment charging murder in the first degree) and of unlawfully carrying a firearm, G. L. c. 269, § 10(*a*), and sentenced.[1] Represented by new counsel, he has appealed from the convictions and from the subsequent denial of his mo-

---

[1] Martin was sentenced to life imprisonment on the murder conviction and a concurrent term of three to five years on the firearm charge.

tion for a new trial. Martin's sole contention at trial was lack of criminal responsibility and the dominant issue on appeal concerns whether that contention was prejudicially undermined by violations of G. L. c. 233, § 23B, as explained in *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977). We conclude that there must be a new trial.

Necessary background for decision must be set out at some length. About 10:00 P.M. on February 18, 1981, the Pittsfield police responded to the scene of a shooting outside a pizza parlor in Pittsfield. The victim, John Fontaine, Sr., was discovered lying near his automobile, dead. An open buck knife (later identified as belonging to Fontaine) and several spent shell casings were found near the victim. Witnesses indicated that they had seen Fontaine drive up to the restaurant, leave his automobile, and call out for Martin. Fontaine and Martin confronted each other for a few moments, after which Martin fired several shots at Fontaine from a handgun. Following the shooting, Martin drove away in his automobile. He was arrested the next day in Albany, New York. The handgun was never found.

After the indictments were returned, Martin was committed to Bridgewater State Hospital, pursuant to G. L. c. 123, § 15(*b*), for competency and criminal responsibility examinations. At Bridgewater he was examined by the hospital's medical director, Dr. William S. James, a psychiatrist. Dr. James concluded, in separate written reports, that Martin was competent to stand trial but was not criminally responsible for his actions at the time of the shooting by reason of a mental illness "most probably paranoia or paranoid disorder." In his responsibility report Dr. James noted that Martin would discuss the incident only up to the time when Fontaine had called out to him, after which Martin "refused to talk more about what happened."

Upon learning of Dr. James' responsibility report, the Commonwealth moved to ascertain whether Martin intended to raise an issue of lack of criminal responsibility and, if so, whether he intended to offer psychiatric testimony based on statements by him revealing his state of mind at the time of the

shooting. See Mass.R.Crim.P. 14(b)(2)(A), 378 Mass. 878 (1979). After the motion was answered,[2] Martin was ordered to submit to a second examination by Dr. Marc A. Whaley, a psychiatrist. A detailed protective order to govern this examination was fashioned in keeping with the requirements of Mass.R.Crim.P. 14(b)(2)(B), 378 Mass. 878 (1979). See the *Blaisdell* case, 372 Mass. at 768-769.[3]

After examining Martin, Dr. Whaley agreed with Dr. James' opinion that Martin was mentally ill but indicated that he could not reach a firm conclusion on the question whether Martin's mental illness rendered him criminally insane at the time of the shooting. Dr. Whaley asked the prosecutor's office to have Martin examined by a psychologist, and such an examination was ordered.[4] After receiving the results of that examination, Dr. Whaley submitted a written report which concluded that Martin was mentally ill (by reason of paranoia or a paranoid disorder) but that he was able to appreciate the nature of his acts

---

[2] The notice filed by defense counsel identified Dr. James as the defendant's expert on the question of insanity and stated that Dr. James intended to rely "in part" upon statements of the defendant as to his mental condition at the time of the crime or as to his responsibility for the crime.

[3] The protective order provided: (1) that Dr. Whaley's report would not be made available to either prosecution or defense unless a judge determined that it did not contain any information deemed privileged under G. L. c. 233, § 23B; (2) that if the report contained both privileged and non-privileged information the judge could, in his discretion, disclose the non-privileged aspects; and (3) that if the report contained "matter, information or evidence based on the [d]efendant's testimonial statements" it would be sealed and not be made available at trial until Martin, in connection with the question of insanity either expressed his intent to testify on his own behalf or to introduce psychiatric testimony based in whole or in part on his extrajudicial or judicial statements. The order also made clear that Dr. Whaley would "be permitted to testify as to [his] opinion based on the [d]efendant's testimonial statements ONLY if the [d]efendant offers testimony based on his statements" (emphasis original).

[4] This examination was not made subject to the terms of the protective order. However, a letter from an assistant district attorney to the psychologist stated that "[a] judge will . . . review your report and make such orders as may be necessary before copies are furnished to either [the district attorney's office] or defense counsel." It does not appear from the record that any such review ever took place.

and to conform his behavior to the requirements of the law. Dr. Whaley reached this conclusion after probing Martin about his state of mind at the time of the shooting. Among other things, Dr. Whaley's report recited these statements by Martin as to his thought processes: "At any rate, he recalls Mr. Fontaine standing there with his hand on his chest and Mr. Martin believing that Mr. Fontaine had a knife in his hand . . . . At this particular moment, Mr. Martin described his mental state as being 'I felt like a new person . . . there was a hot feeling going through my body, and I never felt so good in my life.' At that moment, he recalls shooting Mr. Fontaine eight times, emptying the gun, and 'I felt good . . . I knew I would get arrested, and I didn't care, and I didn't want to get arrested there because they had friends in the police department and in the courts . . . and they might even kill me.'" In Dr. Whaley's opinion these statements provided an important basis for concluding that Martin was "reassert[ing] his masculine prowess" and not acting under the duress of mental illness. Shortly after its filing, Dr. Whaley's report found its way into the prosecutor's hands. No effort appears to have been made to seal its contents, or to deal with it in conformity with the explicit and unambiguous requirements of the protective order (see note 9, *infra*).

During trial, testimony was elicited about the details of the homicide, Martin's arrest in Albany, and his long-standing obsessive fear of Fontaine and others who Martin thought intended to injure or kill him.[5] The focus thereafter turned to the question of Martin's criminal responsibility. The defense called Dr. James, who testified that Martin harbored delusions that Fontaine had taken away his wife, ruined his business, and had intended to kill him, either alone or with help from "organized crime." After describing Martin's fears of Fontaine,

---

[5] This aspect of the Commonwealth's case included testimony by friends or relatives of Martin who visited him in jail about his obsession with killing Fontaine, and his belief that he would have to accomplish the killing soon or lose the opportunity for several more years, his relief at having finally achieved his goal, his feeling "like a new man" as a result of the homicide, and his intention to kill others who "did him in."

Dr. James testified that Martin believed that Fontaine had come to the restaurant to kill him. Dr. James further testified that Martin had expressly refused to discuss his state of mind at the time of the shooting or directly admit to killing Fontaine. Based on the information available to him (including interviews in which Martin declined to discuss his state of mind when he fired the handgun), Dr. James concluded that Martin was suffering from paranoia at the time of the shooting which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Prior to the prosecutor's offer of Dr. Whaley's testimony in rebuttal, the colloquy set forth in the margin took place between the judge and counsel.[6] After reviewing his examina-

---

[6] THE JUDGE: "My question, Mr. [District Attorney] was simply to do with 23(b) of Chapter 233, is your psychiatrist going to testify to any statements made to him by the defendant?"

THE PROSECUTOR: "Yes, I tried to go over with the witness the contents of the statement, and I have instructed the witness that under that statute statements made to him that constitute a confession or inculpate the defendant in the crime itself as distinguished from the defendant's mental state at the time cannot be put into evidence."

THE JUDGE: "That is right, it's just plain inadmissible under that statute."

DEFENSE COUNSEL: (Interposing) "Unless I open it up."

THE JUDGE: "I'm not so sure even on that."

"There is something about statements themselves from the defendant which you can open up, but I'm not positive you can open up even what amounts to a confession or admission of guilt."

THE PROSECUTOR: "It is not my intention to put in an admission or a confession of guilt, your Honor."

THE JUDGE: "If we get that far, we would have to voir dire it if it's getting that close."

THE PROSECUTOR: "I will put in statements made by the defendant just prior to the shooting, immediately after the shooting and there will be elicited from the doctor the fact that he had an in depth conversation with the defendant concerning each step of the commission of the crime."

THE JUDGE: "All you can do is instruct him and hope that he follows your instructions.

"[To defense counsel] If you want to open it up . . . the confession or what amounts to a confession or admission of guilt, would you come over to the side bar first?"

DEFENSE COUNSEL: "I will. I would be in cross-examination of course, of the doctor."

THE JUDGE: "All right, call your witness."

tion of Martin and the standard for determining criminal responsibility, Dr. Whaley rendered his opinion that Martin's mental disorder did not render him unable to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Dr. Whaley repeated and emphasized that his opinion was based on Martin's statements about his state of mind at the precise time of the shooting, in particular the statements set forth earlier in the text. Defense counsel made no objection to Dr. Whaley's testimony concerning the statements. However, later in Dr. Whaley's direct examination, defense counsel objected to questions concerning conversations between the psychiatrist and Martin pertaining to Martin's disposal of the weapon. Defense counsel expressly grounded this objection on the "ground rules for the testimony," see note 6, *supra*; an apparent reference to the applicability of G. L. c. 233, § 23B.

The only other event of significance occurred in the prosecutor's final argument. As might be expected, the final arguments of counsel centered on the question of which of the two psychiatrists should be found to be more credible. In an attempt to discredit Dr. James' testimony and to support Dr. Whaley's testimony, the prosecutor launched into the argument set forth in the margin.[7] These comments were not objected to by defense counsel.

---

[7] After paraphrasing the legal test for insanity the prosecutor argued as follows:

"Not an incapacity. Not a little capacity. A substantial incapacity. That is what the standard is and you know when you heard Doctor James testify yesterday, you never heard him mention that.

"You never heard it at all. And isn't it amazing Doctor James makes a diagnosis as to his mental condition at the time of the shooting, and I said well, how about earlier in the morning?

"He said, I don't know, I didn't bother with that. How about right after the shooting? No, I didn't bother with that.

"The only thing Doctor James said was — I concentrated on that time when he was shooting as to whether or not he understood the wrongfulness of his act. Then no other time did I bother with it.

"I asked the Doctor, did you ever talk to him about the shooting? Well, no, he wouldn't talk to me about it.

"So the only time period that this defendant wouldn't discuss with the psychiatrist who says that he didn't understand the wrongfulness of his act

1. *Blaisdell* v. *Commonwealth,* 372 Mass. 753 (1977), interpreted the provisions of G. L. c. 233, § 23B,[8] to impose stringent safeguards on the use of incriminating statements made by an accused in the course of a compelled psychiatric examination. *Blaisdell* noted that a defendant who intends to raise the issue of his criminal responsibility at trial may be compelled, in the interests of fairness to the prosecution, to submit to a court ordered psychiatric examination. "This is so because the defendant, by voluntarily proffering evidence [of lack of responsibility] to the jury, has waived his privilege against self-incrimination to a limited extent." *Commonwealth* v. *Callahan,* 386 Mass. 784, 789 (1982). By submitting evidence of insanity, however, a defendant does not make a total waiver of his privilege. A full waiver will occur only when the defendant offers testimony either through himself or through experts based on his testimonial statements. 372 Mass. at 769. Otherwise, "[g]overnment psychiatric testimony . . . shall be given in a manner consistent with the requirements of G. L. c. 233, § 23B," *ibid.,* which excludes all statements

is the act that we are now considering wrongful.

"He never talked to him about it. He never talked about that one thing. And yet, he is so sure of his decision and he never talked to him about it.

"But the psychiatrist this morning, Doctor Whaley, he says oh, yes, the defendant talked to me. Why the defendant talked to Doctor Whaley and didn't talk to Doctor James I will never know, but he talked to Whaley at great length and in minute detail about everything that he did in the course of that shooting.

"Whaley says he had the substantial ability to appreciate the wrongfulness of his act. He knew what he was doing when he did it, and he knew what he wanted to do and he did it, and he knew it was wrong."

[8] General Laws c. 233, § 23B, as amended by St. 1970, c. 888, § 27, provides: "In the trial of an indictment or complaint for any crime, no statement made by a defendant therein subjected to psychiatric examination pursuant to sections fifteen or sixteen of chapter one hundred and twenty-three for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged."

by a defendant constituting a "confession of guilt." The term "confession of guilt" was broadly defined in *Blaisdell* to "include inculpatory statements constituting admissions short of a full acknowledgement of guilt." 372 Mass. at 763. We read the *Blaisdell* and *Callahan* decisions together as prohibiting the introduction in evidence of a defendant's testimonial statements (in the nature of confessions or, as here, admissions) disclosed in the course of a court-ordered psychiatric examination unless the defendant has first placed the statements in evidence either through his own testimony or through the testimony of his expert.

There is no question that Dr. Whaley's testimony disclosing Martin's statements about his state of mind at the time of the shooting constituted the use of material interdicted by G. L. c. 233, § 23B.[9] The statements meet the *Blaisdell* definition of inculpatory statements. See also *Commonwealth* v. *Callahan*, 386 Mass. at 788. Not only did they form the core of Dr. Whaley's opinion but they could also have materially affected the jury's consideration of the intent and malice requirements of second degree murder. The testimony should not have been admitted because the defendant did not testify and because we do not read Dr. James' limited testimony on Martin's statements to him involving the events leading up to the shooting as opening the door to the revelation of his inner thought processes at the critical time. The error in the admission of the statements was exacerbated by the prosecutor's closing argument, see note 7, *supra,* which sought to discredit Dr. James' opinion. Both of these events touched directly (and adversely) on Martin's constitutionally secured right to remain silent. See *Commonwealth* v. *Burke,* 339 Mass. 521, 532-533 (1959); *Commonwealth* v. *Hawley,* 380 Mass. 70, 82-86

---

[9] There also appear to have been serious violations of the protective order, see note 3, *supra,* made pursuant to Mass.R.Crim.P. 14(b)(2)(B)(i) through (iii), in the handling of Dr. Whaley's report. The record contains no explanation of why Dr. Whaley's report was disclosed to the prosecutor after it was filed, or explanation why the practice mandated by the second paragraph of rule 14(b)(2)(B)(iii), comprehensively restricting disclosure of privileged parts of a report of a court-ordered psychiatric examination, was not followed.

(1980); *Commonwealth* v. *Smith,* 387 Mass. 900, 908-909 (1983); *Commonwealth* v. *Kendall,* 9 Mass. App. Ct. 152, 160-162 (1980).

2. We cannot accept the Commonwealth's arguments that defense counsel's failure to object to some of the invasions of the privilege precludes relief, or that the errors, viewed in the context of the entire trial, are harmless. In our view, the admission of Martin's statements, the cross-examination of Dr. James, and the prosecutor's final argument, could only have left the defendant's claim of insanity in shambles by creating the impression with the jury that critical information on the issue of responsibility had been furnished to the Commonwealth's expert but withheld from the defendant's expert. We have no hesitation in concluding (if it is even necessary to analyze the issues from this perspective in the light of *Blaisdell)* that the aggregate of the problems described above gave rise to a substantial risk of a miscarriage of justice, see *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967); *Commonwealth* v. *Howell,* 386 Mass. 738, 739 (1982), and that they would fail any reasonable test for determining the existence of harmless error,[10] *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445-446 (1982). No other argument has been made by the Commonwealth, or discussed by the judge in his memorandum, which persuades us that a new trial should be denied.

---

[10] The argument is also made that defense counsel was engaging in a trial strategy by failing to object to the admission of the privileged testimony. The record suggests that defense counsel, despite some warnings from the judge, misread the stringent requirements imposed by *Blaisdell* and as a consequence he largely misdirected his efforts to keeping out Martin's statements about disposal of the weapon. If the case needs to be analyzed from the perspective of sub-par representation, we would conclude that Martin was ineffectively represented under the two-step test for deciding that question, see *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979), because "trial counsel's inattention, negligence or ignorance affected [Martin's] trial in such a way and to such an extent as to prejudice his defense." *Commonwealth* v. *Cook,* 380 Mass. 314, 321-322 (1980). See also *Commonwealth* v. *Levia,* 385 Mass. 345, 353 (1982). We also note that the difficulties in the case may have stemmed from the good faith failure of both counsel at the trial to grasp the scope of the principles of the *Blaisdell* case and from the fact that *Commonwealth* v. *Callahan,* 386 Mass. 789 (1982), which reinforces those principles, had not been decided when this case was tried.

3. The discussion above has been largely directed to the murder charge. The carrying charge also involves a mens rea element. See *Commonwealth* v. *Jackson,* 369 Mass. 904, 916 (1976); *Commonwealth* v. *Papa, post* 987 (1984). Since that issue could have been decided favorably to the defendant by the jury's conclusion on proper evidence that the Commonwealth had not proved that Martin was sane at times relevant to the handgun offense, a new trial is also required on that charge.

4. The balance of the issues argued which may occur at retrial are questions calling for the exercise of tactical judgments by Martin's new counsel or questions best considered upon the state of the evidence at retrial. All of the issues involve settled principles of law. We think they can be adequately handled in the context of the evidence at retrial and do not call for discussion at this time.

The judgments are reversed, the verdicts are set aside, and both indictments are to stand for a new trial.

*So ordered.*