COMMONWEALTH vs. ARTHUR R. MARTIN.

Berkshire.   October 3, 1984. — January 29, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Insanity. Practice, Criminal,* Psychiatric examination.

At the trial of indictments for murder and for unlawfully carrying a firearm,
   as to which the defendant had interposed a claim of insanity, the admis-
   sion in evidence of certain inculpatory statements the defendant had
   made during a court-ordered psychiatric examination violated the prohi-
   bition contained in G. L. c. 233, § 23B, and, in the circumstances,
   presented a substantial risk of a miscarriage of justice. [768-788]

INDICTMENTS found and returned in the Superior Court De-
partment on March 2, 1981.

The cases were tried before *Lawrence B. Urbano,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*John M. Thompson* for the defendant.

*Lee Diane Flournoy,* Assistant District Attorney, for the
Commonwealth.

NOLAN, J. On September 17, 1981, the defendant was con-
victed of murder in the second degree and of carrying a firearm
without legal authority, G. L. c. 269, § 10 (*a*). Following the
appointment of new counsel, he filed a motion for postconviction
relief. This motion was subsequently denied, and the defendant
appealed. The Appeals Court reversed the Superior Court
judge's denial of the defendant's motion, and ordered that a
new trial be held on both indictments. *Commonwealth* v. *Mar-
tin,* 17 Mass. App. Ct. 717, 726 (1984). This matter comes
before us on further appellate review. The primary issue on
appeal concerns whether the defendant's contention that he
lacked criminal responsibility was prejudicially undermined by
violations of G. L. c. 233, § 23B. See *Blaisdell* v. *Common-
wealth,* 372 Mass. 753 (1977). For the reasons stated below,

we reverse the order of the Superior Court and remand this matter for a new trial.

We summarize briefly the facts relative to the issue before us.[1] On February 18, 1981, the Pittsfield police found the victim, John Fontaine, lying dead near his automobile, outside a pizza parlor. Several spent shell casings and an open buck knife were found near the victim. The knife was later identified as the property of the victim.

According to witnesses, the victim drove to the pizza parlor on the night of the shooting, left his automobile, and called out to the defendant. A brief confrontation between the pair ensued, and several gunshots were heard. The defendant then drove away in his automobile. He was arrested the following day in Albany, New York. The handgun used in the shooting was never recovered.

The defendant was indicted for murder in the first degree and for carrying a firearm without legal authority. He subsequently was committed to Bridgewater State Hospital for examinations to determine competency and criminal responsibility. See G. L. c. 123, § 15 (b). After examining the defendant, Dr. William S. James concluded that the defendant was competent to stand trial but was not criminally responsible for his actions at the time of the shooting due to mental illness. In his written report, Dr. James noted that the defendant refused to discuss the shooting beyond the point when the victim called out to him.

After the defendant indicated that he intended to assert his lack of criminal responsibility as a defense, the Commonwealth sought and was granted an order which required the defendant to submit to a second psychiatric examination by Dr. Marc A. Whaley. This second examination was to be conducted in accordance with the terms of a detailed protective order. See Mass. R. Crim. P. 14 (b) (2) (B), 378 Mass. 878-880 (1979).

---

[1] The opinion of the Appeals Court contains a more detailed description of the factual background of this case. See *Commonwealth* v. *Martin*, 17 Mass. App. Ct. at 718-722.

On the basis of his examination, Dr. Whaley was unable to reach a conclusion as to whether the defendant's mental illness rendered him criminally insane at the time of the shooting. Dr. Whaley requested that the prosecutor's office arrange to have the defendant examined by a psychologist. The Commonwealth's motion for a psychological examination of the defendant by Dr. William Rafferty subsequently was allowed. Dr. Whaley received the results of Dr. Rafferty's report. Dr. Whaley then submitted a written report to the court, in which he concluded that, although the defendant was mentally ill, he was able to appreciate the nature of his acts and to conform his conduct to the requirements of the law. This report contained statements by the defendant with respect to his thought processes at the time of the shooting. In part, the report stated that the defendant "recalls Mr. Fontaine standing there with his hand on his chest and Mr. Martin believing that Mr. Fontaine had a knife in his hand . . . . At this particular moment, Mr. Martin described his mental state as being 'I felt like a new person . . . there was a hot feeling going through my body, and I never felt so good in my life.' At that moment, he recalls shooting Mr. Fontaine eight times, emptying the gun, and 'I felt good . . . I knew I would get arrested, and I didn't care, and I didn't want to get arrested there because they had friends in the police department and in the courts . . . and they might even kill me.'"

In this report, Dr. Whaley considered whether the defendant was suffering from a mental disease at the time of the alleged crime, and whether the disease had caused his criminal behavior. In analyzing these issues, Dr. Whaley relied, in part, upon what he termed the defendant's "description of his mental state precisely at the time of the shooting." Based upon the defendant's statements, Dr. Whaley concluded that the defendant's behavior at the time of the shooting stemmed from "his reassertion of masculine prowess," rather than a diagnosable mental disease.[2] In an apparent violation of the protective order,

---

[2] Dr. Whaley interpreted the defendant's statements as follows: "[I]n his description of his mental state precisely at the time of the shooting, it is apparent that Mr. Martin was motivated by reestablishing his sense of

the prosecutor's office received a complete copy of Dr. Whaley's report shortly after it was filed.

At trial, the Commonwealth presented testimony concerning the details of the shooting, the defendant's arrest in Albany, and his obsessive fear of the victim. The defense offered the testimony of Dr. James, who opined that the defendant's mental illness substantially diminished his ability to appreciate the wrongfulness of his acts. Dr. James was asked whether the defendant was "able to control substantially his acts as a result of his mental illness." Dr. James' response was that "[o]ther than that [the defendant] would have had some difficulty in knowing what was an appropriate act, I believe he was ——." Dr. James further testified that, in his opinion, the defendant was not criminally responsible on February 18 for John Fontaine's murder.

The Commonwealth offered the testimony of Dr. Whaley to rebut Dr. James' conclusions.[3] Dr. Whaley described his examination of the defendant and stated that in evaluating the defendant's condition he had considered the results of psychological tests that had been administered to the defendant by a psychologist. Dr. Whaley concluded that at the time of the shooting the defendant suffered from a mental disease, but was able substantially to conform his conduct to the requirements of law. Dr. Whaley asserted that the defendant's mental illness did not cause him to have a substantial incapacity to appreciate the criminality of his acts on the date of the shooting. He testified that in arriving at this conclusion he considered the defendant's statements to him concerning the time period

---

masculinity in the social sphere, as well as psychological sphere. That is, he did not want to be seen as someone who walked away from Mr. Fontaine, and his description of the hot feeling coursing throughout his body and his never feeling so good in his life at the precise instant of the shooting, is interpreted by this examiner as stemming from his reassertion of masculine prowess, as opposed to paranoid distortions which would be considered stemming from a diagnosable mental illness."

[3] Prior to Dr. Whaley's testimony, a conference was held at the side bar with respect to the restrictions upon Dr. Whaley's testimony mandated by G. L. c. 233, § 23 (*b*). *Commonwealth* v. *Martin*, 17 Mass. App. Ct. at 721 n.6.

immediately prior to and following the shooting. He repeated several of the defendant's statements in the course of his testimony. In his testimony, Dr. Whaley repeated some, but not all, of the statements contained in the written report from which we have quoted above. Because Dr. Whaley's testimony forms the basis for our disposition of this appeal, we set forth pertinent excerpts from the transcript below.[4] The defendant did not object to the prosecutor's questions regarding these statements.

[4] THE PROSECUTOR: "Just prior to the shooting, when Mr. Fontaine's automobile was in the area of the El Italia Sub Shop, can you tell us what Mr. Martin's mental state was at that time?"

THE WITNESS: "I have information that leads me to a fairly good description of his mental state at that time."

THE PROSECUTOR: "And what information is that?"

THE WITNESS: "The information came mainly from Mr. Martin in my discussion with him."

THE PROSECUTOR: "Just as to his mental state, could you tell us what his mental state was?"

THE WITNESS: "He felt threatened by Mr. Fontaine. He believed that Mr. Fontaine may have been there to kill him.

"He was not sure how that would be accomplished, and that it was a public place, but his thought was how was this man going to hurt me or kill me at this point in time.

"He, as he walked out of the place, the Pizza Parlor, he told me that he had the thought that perhaps he should leave the area; that that thought occurred to him, but that he did not do so because of two reasons.

"On the one hand, he did not want to get shot in the back, as he put it, implying that Mr. Fontaine would shoot him as he walked away.

"Secondly, his thinking process at that time was that he did not want to be known as someone who would walk away from Mr. Fontaine. In other words, he was describing something about his own self image as perhaps perceived by others as well. . . ."

THE PROSECUTOR: "Did Mr. Martin describe to you, sir, just prior to the shooting his own mental state."

THE WITNESS: "Yes, he did."

THE PROSECUTOR: "Can you tell us what he said?"

THE WITNESS: "He described himself as not feeling particularly angry or emotional at the time, although as I indicated, he did believe that he was in some danger based on some gestures that the victim made at the time."

THE PROSECUTOR: "Now, did he say something about feeling like a new man?"

THE WITNESS: "He did."

THE PROSECUTOR: "Can you tell us just in terms of his description of his mental state, what he said?"

THE WITNESS: "Yes. At the particular moment of the shooting, basically or perhaps just before he described a feeling to me, what he called a hot feel-

In his closing argument, the prosecutor noted the difference between the testimony of the two expert witnesses. He emphasized the fact that the defendant did not discuss the shooting with Dr. James. He stated that the defendant "talked to Whaley at great length and in minute detail about everything that he did in the course of that shooting."

*Introduction of testimony by Dr. Whaley in violation of G. L. c. 233, § 23B.* The defendant did not object to Dr. Whaley's testimony concerning statements made by the defendant with respect to his mental state at the time prior to and following the shooting. We consider, therefore, whether there exists a substantial risk of a miscarriage of justice. *Commonwealth* v. *Foley*, 358 Mass. 233, 236 (1970). We conclude that such a risk exists, because Dr. Whaley's testimony included statements that should not have been introduced in evidence in

---

ing coursing throughout my body. I felt like a new man then. I never felt so good in my life."

THE PROSECUTOR: "Now, immediately after the shooting, and he described to you the incident of the shooting, did he not — yes or no?"

THE WITNESS: "He did."

THE PROSECUTOR: "But immediately after the shooting, did he say something to you concerning his state of mind?"

THE WITNESS: "He did."

THE PROSECUTOR: "What was that?"

THE WITNESS: "It was more or less a continuation of his state of mind immediately prior to the shooting in which he stated that he felt good.

"He stated that he knew that he would get arrested."

THE PROSECUTOR: "He knew that he would get arrested?"

THE WITNESS: "Those were his words, 'But I didn't care.'

"And that he went on to say that he didn't want to get arrested right there at that Pizza Parlor or in Massachusetts, for that matter, because of that belief that Mr. Fontaine may have had friends in the Police Department or in other high places that might do harm to him. 'And perhaps even kill me.' . . ."

THE PROSECUTOR: "Was there anything else that he did after the commission of the crime and the flight that you would base your opinion on?"

THE WITNESS: "Yes."

THE PROSECUTOR: "Could you tell us what that was?"

THE WITNESS: "He described leaving the scene in a — what he described as a slow fashion, apparently obeying traffic laws."

view of the prohibitions contained in G. L. c. 233, § 23B,[5] as explicated in *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977).

In *Blaisdell*, we construed the statutory term "confession" "to include inculpatory statements constituting admissions short of a full acknowledgment of guilt." *Id.* at 763; see *Commonwealth* v. *Callahan*, 386 Mass. 784, 788 (1982). The Commonwealth argues that the statements at issue were not admissions, contending that they did not discuss the defendant's actions or identify the shooter even though they include statements by the defendant that he expected to be either arrested or killed by the victim's friends. We cannot accept the Commonwealth's categorization of these statements.

In *Commonwealth* v. *Callahan*, 386 Mass. 784, 787 (1982), a psychiatrist testified that during a court-ordered examination the defendant told him that "he was being thrown, quote, the hell out of the house, was enraged, picked up the gun and shot her, with the thought beforehand that 'shoot her, Callahan, and you're . . . you're going to jail for murder.'" We decided that these statements constituted an inadmissible confession of guilt under § 23B, not only because of the defendant's admission that he shot the victim, but also because they tended to show deliberate premeditation. *Id.* at 788. In the instant case, Dr. Whaley did not testify that the defendant specifically stated that he shot the victim. However, the statements that he did repeat in front of the jury do constitute the type of inculpatory statements that § 23B prohibits. In particular, we note the defendant's statement that "he knew that he would get arrested" as tending to show that the defendant shot the victim.

We conclude that the admission of these statements constituted the introduction of testimony proscribed by G. L. c. 233, § 23B, and *Blaisdell*. This error cannot be viewed as harmless,

---

[5] General Laws c. 233, § 23B, as amended by St. 1970, c. 888, § 27, provides: "In the trial of an indictment or complaint for any crime, no statement made by a defendant therein subjected to psychiatric examination pursuant to sections fifteen or sixteen of chapter one hundred and twenty-three for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged."

particularly in light of the prosecutor's reference to Dr. Whaley's testimony in his summation to the jury. See *Commonwealth* v. *Callahan*, 386 Mass. 784, 790 (1982).

The judgments of the Superior Court are reversed, the verdicts are set aside, and the defendant must stand for a new trial.

*So ordered.*