COMMONWEALTH *vs.* GEORGE WILLIAMS.[1]

No. 89-P-458.

Suffolk. January 14, 1991. - May 1, 1991.

Present: DREBEN, KASS, & LAURENCE, JJ.

*Homicide. Evidence*, State of mind. *Insanity. Constitutional Law*, Assistance of counsel. *Practice, Criminal*, Psychiatric examination.

Admissible evidence with respect to a murder victim's state of mind elicited by defense counsel from a defense witness provided no basis for a claim of ineffective assistance of counsel. [547-548]

A defendant convicted of murder in the second degree did not demonstrate that he was denied effective assistance of counsel because his trial counsel elicited from a defense witness inadmissible testimony that the victim feared the defendant would kill her, where the action of counsel was a reasonable tactical decision. [548-549]

At a murder trial in which the defendant testified and in rebuttal the Commonwealth presented testimony of a psychiatrist who had examined the defendant pursuant to court order, defense counsel's reasonable tactical decision not to object to the testimony did not provide a basis for a claim of ineffective assistance of counsel. [549-552]

INDICTMENT found and returned in the Superior Court Department on December 10, 1985.

The case was tried before *Sandra L. Hamlin*, J.

*Eric Brandt*, Committee for Public Counsel Services, for the defendant.

*Mark D. Zanini*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. In his trial on an indictment charging murder in the first degree in the death of his wife, Regina Williams, by strangulation, the defendant's main defenses were based

---

[1]This case was originally released as a Memorandum and Order under Rule 1:28 on May 1, 1991.

on his mental condition. On appeal from his conviction[2] of murder in the second degree, he claims that he was denied effective assistance of counsel because his trial attorney (1) elicited from his own witness, Reverend Samuel Hogan, inadmissible evidence which tended to show a specific intent to kill, and (2) failed to object to equally prejudicial evidence from a rebuttal witness of the Commonwealth, Dr. Jorge Veliz. We affirm.

Prior to trial, the defendant's counsel filed a motion for leave to withdraw. The defendant did not wish to go to trial with court appointed counsel. He claimed that a college was left to him and that he expected to receive in excess of $200 million any day. He refused to discuss the case with his court appointed lawyer. The court denied the motion for leave to withdraw; the defendant had been found indigent and had not, in two years, hired private counsel. To the extent that counsel was hampered by the defendant's lack of cooperation, the defendant cannot justifiably complain. *Commonwealth* v. *Lee*, 394 Mass. 209, 218 (1985). See also *Commonwealth* v. *Moran*, 17 Mass. App. Ct. 200, 206 (1983). While the specific challenges to defense counsel's alleged failures are not directly attributable to the defendant, the latter's refusal to communicate with defense counsel about the facts clearly exacerbated the difficulties of mounting a convincing defense.

The jury could have found the following facts. Early in the afternoon of July 25, 1985, Boston police, responding to a report of cardiac arrest at an apartment in Roxbury, found the victim, the defendant's wife, Regina Williams, dead on the living room floor, the sash from the defendant's bathrobe around her neck. The defendant, who had called 911, displayed an unusual lack of emotion while he spoke to the investigating officers. He told them that he had returned home at approximately 1:10 P.M. and had found his wife on the floor stricken by what he thought was a heart attack.

---

[2] Asserting that his claim of ineffective assistance depends on no new facts, the defendant relies on the existing record. See *Commonwealth* v. *Frisino*, 21 Mass. App. Ct. 551, 556 (1986).

At the request of the police the defendant gave a statement which was taped. The audible portions were played at trial, and the jurors were also provided with a transcript. The defendant (according to the tape) told the police that he and his wife had had breakfast with their two children, that he had called in sick at work, and then had left the house between 8:30 and 9:00 A.M. with one of the children. They went to various places, including a jewelry store, before returning home at 1:00 P.M. He said that his wife had been involved in prostitution prior to their marriage, that she was having an affair with a woman with whom she worked, that the two women had traveled together to Philadelphia about a month before, that he had seen his wife kissing the woman about three weeks earlier, and that, on the day before his wife was killed, he had accused the woman of raping his wife.

The defendant was told that he might be a suspect in his wife's killing and was advised of his rights. The defendant remained at the police station for three hours after the interview ended, despite being told on multiple occasions that he was free to leave. At his request he was taken to the psychiatric ward at Massachusetts General Hospital and was later admitted to the Arbour Hospital for depression and suicidal thoughts. He was arrested there on July 30.

The evidence against the defendant was strong. The defendant admitted to a family friend that he had committed the crime. He had written a letter to the victim's family asking for "your forgiveness for the death of Regina."

The medical examiner testified that the victim had been strangled, that bruises on her body were consistent with a struggle just before her death, that in his opinion she had died at 8:00 A.M. or before, and that her stomach was empty.[3] A neighbor testified that between 5:45 and 6:30 on the morning of July 25 she had heard loud voices and noises which sounded "like a body being banged up against a wall." There were no signs of forced entry into the apartment.

---

[3]The victim's empty stomach appears to contradict the defendant's statement to the police that the family had had breakfast together.

A friend of the victim who lived in the same building testified that, a month before her death, the victim came to the friend saying that the defendant was beating her and the children. The victim used the friend's telephone to call the police. A police officer who had responded to that call testified that the defendant's wife had told him that she and the defendant had had a fight and that the defendant had beaten her with a clothes hanger. The officer drove the defendant's wife and her children to the apartment of some relatives.

The woman whom the defendant accused of having an affair with his wife testified that no such relationship had ever existed. The owner of the jewelry store the defendant visited on the day his wife was killed testified that the defendant had picked up a watch left for repair more than three months earlier, and, because the defendant did not have a claim ticket, he signed a log book instead.[4]

Facing a formidable task, defense counsel was also hampered by the refusal of the defendant to talk to him about the events of July 25. He failed to cooperate with psychiatrists appointed on motions of defense counsel, and no expert witnesses testified on the defendant's behalf. Defense counsel endeavored to portray the defendant as a person with a history of mental instability who, in the weeks preceding his wife's death, had become uncontrolled because of his irrational fixation that she was engaged in a lesbian relationship. He introduced reports of the defendant's previous hospitalizations, one from Hahnemann Hospital in Philadelphia in 1978, two from Arbour Hospital (1984 and 1985), and from Massachusetts General Hospital.

1. *Testimony of Reverend Hogan.* As indicated earlier, the defendant's claim of ineffective assistance of counsel relates primarily to evidence of two witnesses, Rev. Samuel Hogan, and Dr. Veliz, a rebuttal witness of the Commonwealth. Rev. Hogan, the defendant's minister, testified that around July 10 or 12 (the victim died July 25), he noticed a change in the defendant. He had lost weight, appeared to be under "tre-

---

[4]In his closing argument, the prosecutor argued that the defendant had visited the jewelry store that day in order to fabricate an alibi.

mendous strain," and had stopped coming to church regularly. The defendant had told the minister that he couldn't work and was under pressure because his wife was in a relationship with another woman. Rev. Hogan also testified to other recent irrational behavior on the defendant's part. After his arrest, he sent letters to other ministers accusing Rev. Hogan of raping his wife and of being a pimp and a thief.

The defendant points to two statements made by Rev. Hogan to sustain his claim of ineffective assistance of counsel. The first was his testimony that about a month or six weeks before her death, the victim had told him she was planning to leave the defendant. Contrary to the contention of the defendant's appellate counsel, the jury would have been warranted in finding that these statements were made during a time when the defendant had an irrational delusion about his wife's relationship with another woman.

The defendant argues that the victim's statement that she intended to leave the defendant was inadmissible because there was no showing that the defendant had any knowledge of Regina's intent to leave. There was ample evidence that the relationship between the defendant and his wife had deteriorated, and that his wife had told others of her intent to leave. Rev. Hogan advised the defendant to forgive his wife or, if he was unable to forgive her, to pack up his things and leave. "If the victim was willing to tell third persons that her relationship with the defendant had deteriorated and that she had told or would tell the defendant that their relationship would end, it is inferable that by word or action, or both, she communicated her feelings to the defendant." *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977). *Commonwealth* v. *Todd*, 394 Mass. 791, 797 (1985). For this reason, evidence of the victim's intent to leave was not rendered "inadmissible because of the absence of direct evidence that the victim had communicated her attitude to the defendant." *Commonwealth* v. *Borodine*, 371 Mass. at 9.

The purposes for which the jury could use this testimony were properly limited by the judge in her charge. Moreover,

evidence of the prior assault on the victim, her fear, and intent to leave was already before the jury from the testimony of the neighbor and the police. Thus, Rev. Hogan's additional testimony about the victim's state of mind not only bolstered the evidence of the defendant's irrational behavior, but was in any event cumulative and not prejudicial.

Rev. Hogan also testified that the victim had told him that she could not go home because she was afraid that the defendant would kill her. On cross-examination, Rev. Hogan reported that the victim had said of the defendant, "[Y]ou don't know what he's like."

The defendant is correct that the victim's statement that she feared the defendant would kill her was inadmissible.[5] See *Commonwealth v. DelValle*, 351 Mass. 489, 492-493 (1966); *Commonwealth v. Bond*, 17 Mass. App. Ct. 396, 399 (1984); *United States v. Brown*, 490 F.2d 758, 765 (D.C. Cir. 1974), McCormick, Evidence § 296 (3d ed. 1984). However, defense counsel, in view of the strong evidence linking the defendant to the killing, could reasonably have determined that the risk of prejudice to the defendant's case if this testimony were admitted was outweighed by its corroboration of the defendant's insanity, his irrational hostility and his lack of control because of his view of his wife's relationship with the other woman. As stated in *In re Pray*, 133 Vt. 253, 254 (1975),

> "Tactically, [the insanity] defense poses many dilemmas of serious proportions to counsel, and almost always calls for judgment determinations on matters fraught with danger for his client. It may not be enough to minimize the criminal event itself by restrained cross-examination; it may, in some cases, seem necessary to emphasize and highlight the brutality and savagery of the event to establish, at least in the lay mind of a juror, that the criminal acts were irrational. Evidence assumed

---

[5]Although the judge gave a limiting instruction, the limitation "cannot be viewed as curative." See *Commonwealth v. Bond*, 17 Mass. App. Ct. 396, 400 (1984).

to add to such a conclusion may be deliberately allowed in, even though otherwise objectionable. Counsel must be free to make such decisions without threat, and courts must be free to accept them."

See *Commonwealth v. Callahan,* 401 Mass. 627, 636-637 n.13 (1988). See also *Commonwealth v. Bannister,* 15 Mass. App. Ct. 71, 76-77 (1983) (trial counsel's failure to object to certain testimony and failure to file motions to suppress evidence did not constitute ineffective assistance where the actions were a result of a tactical decision to pursue a defense of lack of criminal responsibility).

Defense counsel's decisions to allow the jury to hear evidence indicating recent hostility, see *Commonwealth v. Robertson,* 408 Mass. 747, 751 (1990), were reasonable tactical ones; the defendant has not met the requirements of showing ineffective assistance of counsel. *Commonwealth v. Saferian,* 366 Mass. 89, 96 (1974). *Commonwealth v. Satterfield,* 373 Mass. 109, 115 (1977). *Commonwealth v Rondeau,* 378 Mass. 408, 413 (1979). *Commonwealth v. White,* 409 Mass. 266, 272-273 (1991). It is required that "challenged tactical judgments . . . be 'manifestly unreasonable.' " *Commonwealth v. White, supra* at 273, quoting from *Commonwealth v. Adams,* 374 Mass. 722, 728 (1978).

2. *Testimony of Dr. Veliz.* The defendant argues that trial counsel also erred in failing to object to the testimony of one of the Commonwealth's rebuttal witnesses, Dr. Jorge Veliz, a psychiatrist at Bridgewater State Hospital where the defendant had been sent for evaluation prior to trial. Dr. Veliz testified that the defendant was not suffering from a major mental illness. He testified that, during the evaluation, the defendant made a statement concerning the morning of his wife's death:

"He said that he asked her about Chrissie [the woman with whom he believed his wife had a lesbian relationship] and the argument started. He said that there was a lot of screaming and hollering, and she put herself near by the closet. He then said that they continued

with difficulties between the two of them, and he think[s] he remembers telling her, 'Bitch, I'm going to kill you.'

"He states at the time he was saying this, and it was like, quotes, it wasn't me. He then proceeds to put his hands around her neck. She tried to escape but fell down, and he continued putting his arms — his hands around her neck as if choking her, and he described all of this, a situation like, '[i]t was like a dream. I felt relief, like a ton of bricks was lifted from me.' "

The defendant argues that this evidence was inadmissible by statute, G. L. c. 233, § 23B,[6] and that the effect of the testimony was to relieve the Commonwealth of its burden of proving that the defendant had in fact committed the crime, to present the Commonwealth's best evidence of specific intent, and to undermine the credibility of the defendant's testimony that he had no memory of the morning of his wife's death.[7]

---

[6]General Laws c. 233, § 23B, as amended by St. 1970, c. 888, § 27, provides:

"In the trial of an indictment or complaint for any crime, no statement made by a defendant therein subjected to psychiatric examination pursuant to sections fifteen or sixteen of chapter one hundred and twenty-three for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged."

[7]Against the advice of counsel — a significant reason for this advice was that the defendant refused to tell counsel what he would say and refused to discuss what occurred on the day of his wife's death — the defendant took the stand. Of the events on the day of his wife's death, he remembered only his wife hitting and kicking their son, and knocking the room divider over while their son was still underneath it. He recalled nothing else until he returned to the apartment at around 1:00 P.M. At one point, defense counsel asked:

Q. "You don't have any memory of arguing with [the victim] and putting that rope around her neck, yelling at her, banging her against the wall?"
A. "No."
Q. "You don't have any memory of that?"
A. "No."
Q. "You're not saying you didn't do it; are you?"

Confessions or admissions made by a defendant during the course of a court-ordered psychiatric examination are generally inadmissible. The defendant, however, may waive his privilege against such compelled self-incrimination. See *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 766 (1977); *Commonwealth* v. *Callahan*, 386 Mass. 784, 789 (1982); *Commonwealth* v. *Harvey*, 397 Mass. 803, 808-809 (1986). See also *Commonwealth* v. *Martin*, 17 Mass. App. Ct. 717, 724 (1984), *S.C.*, 393 Mass. 781 (1985).

Here the defendant took the stand, testified to his recollection of the morning his wife was killed, see note 7 *supra*, and also testified concerning his mental condition.[8] Thus, although the statute would otherwise have made this testimony inadmissible, the defendant arguably waived his privilege to exclude the evidence when he testified. See *Commonwealth* v. *Harvey*, 397 Mass. at 808-809.

The defendant contends that a waiver would have occurred only if he had testified concerning the specific statements he made to Dr. Veliz. We need not consider whether such a narrow reading of the waiver is required. Even if the testimony of Dr. Veliz were inadmissible, defense counsel's action in not objecting does not support the defendant's claim of ineffective assistance of counsel. The decision to allow this evidence to be admitted was part of counsel's deliberate strategy. As he listened to the defendant's testimony (much of which he was hearing for the first time, see note 7, *supra*), counsel realized that the defendant might have an automa-

---

A. "No. No, I'm not."

Q. "You're saying you don't remember?"

A. "I don't remember."

[8]The defendant testified about his past mental illnesses. He claimed that at age ten he was deprived of fifty to seventy-five percent of his academic ability as a result of a drug administered to him after he had witnessed a murder. He testified about two hospitalizations for mental illness before his wife's death, the second of which he claimed was precipitated by his wife's bizarre sexual conduct, about which he spoke at great length. He testified that insanity had always been one of his biggest fears, and that, on the day before the killing, he felt as if he were about to explode and wondered if he was crazy.

tism defense.[9] At side bar during the defendant's testimony, counsel informed the judge that he planned to file a supplemental request for an instruction on that defense. He filed the motion the next day, the same day that Dr. Veliz testified. Counsel's decision not to object to the introduction of the psychiatrist's testimony and to pursue it further on cross-examination, emphasizing the dream-like quality of the defendant's statements and pointing out that his recollection departed somewhat from the actual course of events, appears to have been an intentional tactical choice.

In sum, counsel was not incompetent, inefficient or inattentive. *Commonwealth* v. *Saferian*, 366 Mass. at 96. Following the defendant's conviction and sentencing, the trial judge commented that counsel "did a splendid job in dealing with the defense of this defendant." We find no indication to the contrary.

*Judgment affirmed.*

---

[9]LaFave & Scott, Criminal Law § 4.9 (2d ed. 1986): "A defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness." Automatism has not been allowed as a defense in the Commonwealth to date. See the discussion in *Commonwealth* v. *Genius*, 387 Mass. 695, 700-701 (1982).