## COMMONWEALTH *vs.* THOMAS W. BENOIT.

Barnstable. May 7, 1991. - July 1, 1991.

Present: LIACOS, C J , WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ

*Homicide. Insanity. Practice, Criminal,* Voluntariness of statement, Admissions and confessions, Psychiatric examination, Assistance of counsel. *Evidence,* Admissions and confessions, Privileged communication. *Witness,* Privilege, Expert.

At a murder trial, the judge had no independent obligation to conduct a voir dire on the issue of the voluntariness of the defendant's statements to a telephone operator, where defense counsel did not raise the issue and where there was no evidence that the statements were involuntary. [512-513]

At a murder trial, no substantial risk of a miscarriage of justice was created by the judge's not instructing the jury on the issue of the voluntariness of the defendant's statements to a telephone operator, where the defendant's trial strategy did not make the voluntariness of the statements a live issue and where, in any event, the evidence was not sufficient to raise the issue. [513-517]

A criminal defendant who did not make any attempt at trial to exercise the statutory privilege set forth in G. L. c. 233, § 20B, with respect to communications with a psychotherapist waived that issue for purposes of his appeal. [517-519]

A criminal defendant's State constitutional rights against self-incrimination were not violated by the testimony of a psychiatrist who had examined him pursuant to G. L. c. 233, § 20B, where the testimony, offered in rebuttal to evidence introduced by the defendant with respect to that psychiatrist's alleged observations, was limited to the psychiatrist's diagnosis and observations of the defendant. [519]

At a criminal trial, defense counsel's failure to object to certain testimony did not, in the circumstances, amount to ineffective assistance of counsel. [519-520]

At a murder trial, the judge properly determined that a pathologist was competent to testify with respect to an autopsy at which he was present and the findings of which he had verified. [520]

INDICTMENT found and returned in the Superior Court Department on March 18, 1986.

The case was tried before *Elizabeth J. Dolan*, J.

*J. W. Carney, Jr.*, for the defendant.

*Russel J. Wilson*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree for the killing of his wife, Thomas W. Benoit appeals. Benoit argues that he is entitled to a new trial based on a substantial likelihood of a miscarriage of justice because (1) evidence of a telephone call he made to a telephone operator should not have been admitted because his statements were involuntary; (2) testimony from a psychiatrist who performed a competency examination was erroneously admitted in violation of his constitutional right not to incriminate himself; and (3) the medical examiner who testified had not performed the autopsy and therefore should not have been allowed to testify. Benoit alternatively also asks that we exercise our power under G. L. c. 278, § 33E (1990 ed.), to reduce the verdict to murder in the second degree. We affirm. We decline to exercise our power in favor of the defendant.

The jury could have found the facts as follows. At 5:19 A.M. on March 10, 1986, a telephone company operator in Barnstable received a call from a man who said, "Help me. Help me." The operator asked him what kind of help he needed, but the man did not respond to her questions. The operator connected the call to the Barnstable police station and remained on the line. A police officer picked up the call and heard the man on the line say, "Help me, help me. I killed somebody. I killed my wife." The officer asked the man who he was and from where he was calling. The only response was crying and moaning. The telephone operator traced the call and supplied the police with the address which listed that telephone number. Two police officers went to the apartment at that address, arriving at 5:28 A.M. Both doors to the apartment were locked. An officer looked through a window and saw Benoit lying on the floor with the telephone receiver in his hand. The officer kicked the door

down. The telephone operator and the officer at the police station were still on the line and heard noises consistent with the breaking down of a door.

When the officers entered the apartment, they found two occupants. Benoit was lying on the floor with the telephone receiver in his hand, bleeding from open wounds on both wrists. He did not respond to questions posed by an officer. His breath smelled of alcohol. Benoit's wife lay dead on the bed. She had been beaten, stabbed five times and was strangled. A bloody steak knife was near her body, and another bloody knife and a partially full bottle of whisky were found in the bathroom.

When the police arrived, all the windows to the apartment were closed and secured. The door that was broken down by the police was locked with a deadbolt, and the keys were in the lock inside the apartment. It had been snowing lightly for approximately an hour, and police did not see any footprints in the snow around the apartment.

While being transported to Cape Cod Hospital, Benoit told the paramedics that he could not see anything, that everything was kind of blurry. In the emergency room, Benoit was able to cooperate with doctors by squeezing his hand and moving his fingers on request. Testing showed the level of alcohol in his blood to be .292. At 7:45 A.M., police officers spoke to Benoit in the emergency room. They advised him of the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The police told Benoit he was under arrest for the murder of his wife. Benoit did not respond to the police statements. In the opinion of one of the officers, Benoit did not understand the explanation of his constitutional rights.

At 2:30 P.M., one of the doctors at the hospital examined Benoit. The doctor awakened him and asked him some questions. Benoit responded appropriately to the doctor's questions. In the doctor's opinion, based on Benoit's blood alcohol level at 6:30 A.M. and his appearance at 2:30 P.M., Benoit was intoxicated at the time of his (the doctor's) examination. At 5:20 P.M., police officers again spoke to Benoit. He was awake when they arrived, and his eyes were somewhat

glassy. The officers again advised Benoit of the warnings required by *Miranda*. The police again informed him that he was under arrest for the murder of his wife. He replied, "No, I couldn't have." When asked if he understood his rights, he replied that he did not understand them. His speech was normal; it was not slurred.

At trial, Benoit called only one witness, a psychiatrist, Dr. Yudewitz. Dr. Yudewitz opined that, at the time when Benoit killed his wife, Benoit lacked the capacity to appreciate his acts or to conform his conduct to the requirements of the law, due to a serious mental illness. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

1. *Benoit's telephone conversation.* Benoit, represented by new counsel on appeal, claims that the statements he made in the course of his telephone call to the operator were not "voluntary" because he was "irrational" due to mental disease, intoxication, injury, or a combination of all three. Benoit contends that a new trial is necessary because the judge did not rule that the statements were voluntary, and because, in accordance with Massachusetts "humane practice," the judge did not submit the issue of voluntariness of the statement to the jury. We conclude that there is no substantial likelihood of a miscarriage of justice.

Prior to the Commonwealth's opening statement, Benoit moved to suppress the telephone conversation on the grounds that it was recorded and the tape was made without notice to the caller. According to Benoit, the recording of his telephone call violated G. L. c. 272, § 99. Benoit further argued that testimony from the telephone operator and the police officer who participated in the conversation also should be suppressed as fruit of the poisonous tree. At the hearing on the motion, the judge pointedly asked defense counsel if this was his whole theory on the motion to suppress, and counsel replied that it was. The judge ruled that the tape recording was made in violation of G. L. c. 272, § 99, and therefore was inadmissible.[1] The judge, however, rejected Benoit's argu-

---

[1] We express no view on the correctness of this ruling.

ment that the testimony of the participants in the conversation also must be suppressed.

The judge next considered a motion in limine to determine whether the fact that neither the police officers nor the operator could identify the caller's voice as belonging to Benoit led to the conclusion that evidence of the conversation was inadmissible due to lack of authentication. Benoit pointed out that the telephone operator testified at the suppression hearing that she had heard noises suggesting that the caller had put down the telephone, walked away, and then returned. Benoit argued that evidence was insufficient to show that Benoit and his wife were the sole occupants of the apartment at the time the call was made. The judge ruled that the evidence of authenticity was sufficient to admit the testimony of the participants in the conversation.

Defense counsel also objected to any mention of the telephone conversation in the Commonwealth's opening statement. Counsel's objection was that the witnesses would be unable to authenticate the caller's voice, and that the statements were hearsay. The judge reaffirmed her ruling that the statements were adequately authenticated and were admissible as admissions. The judge also ruled that the statements were relevant to Benoit's state of mind, an issue which Benoit raised by his notice of his intention to present an insanity defense.

Benoit's counsel repeated his objection before each of the participants in the conversation testified. In each instance, his grounds were the same: lack of authentication, hearsay, and fruit of the poisonous tree. At no time during the trial did Benoit raise the issue of the voluntariness of the telephone conversation. Benoit did not request a jury instruction requiring the jury to consider the voluntariness of his statements, nor did he object to the jury instructions as given. We thus limit our examination to determine whether the admission of the telephone conversation created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Brown*, 392 Mass. 632, 636 (1984). *Commonwealth* v. *Tavares*, 385

Mass. 140, 149, cert. denied, 457 U.S. 1137 (1982). *Commonwealth* v. *Brady*, 380 Mass. 44, 54 (1980).

A confession (or admission), whether made to police or to a civilian, is admissible only if it is voluntarily made. *Commonwealth* v. *Allen*, 395 Mass. 448, 456 (1985). Thus, a statement by someone who "by dint of physical or mental impediments is incapable of withholding the information conveyed" cannot be used as evidence against him. *Commonwealth* v. *Paszko*, 391 Mass. 164, 177 (1984). "Statements that are attributable in large measure to a defendant's debilitated condition, such as insanity, see *Blackburn* v. *Alabama*, 361 U.S. 199, 207 (1960); *Commonwealth* v. *Masskow*, 362 Mass. 662, 667-668 (1972) . . . intoxication, see *Commonwealth* v. *Hosey*, 368 Mass. 571, 577-579 (1975), or 'the concussion of a bullet shattering in his head,' *Pea* v. *United States*, 397 F.2d 627, 634 (D.C. Cir. 1967), are not the product of a rational intellect or free will and are involuntary." (Citation omitted.) *Commonwealth* v. *Allen*, *supra* at 455.

If the defendant raises the issue of the voluntariness of his confession, or admission, the trial judge must hold a hearing out of the jury's presence. The judge must determine that the confession or admission was voluntarily given before the jury hears it. *Jackson* v. *Denno*, 378 U.S. 368, 391-394 (1964). *Commonwealth* v. *Brady*, 380 Mass. 44, 48 (1980). Even if the defendant fails to request it, the trial judge may have an obligation in some circumstances to conduct a voir dire to determine the voluntariness of a confession or admission. *Commonwealth* v. *Brady*, *supra* at 48-49. *Commonwealth* v. *Harris*, 371 Mass. 462, 469-472 (1976). Thus, in *Harris*, this court held that the defendant's testimony that he had been beaten by police created an independent obligation on the part of the trial judge to hold such a hearing.

Generally "[a] judge has 'no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial.' *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978)." *Commonwealth* v. *Tavares*, *supra* at 150-151. *Commonwealth* v. *Parham*, 390 Mass. 833, 842 (1984). *Commonwealth* v.

*Brady, supra* at 54. Cf. *Commonwealth* v. *Vazquez,* 387
Mass. 96 (1982) (question of voluntariness raised at suppres-
sion hearing, substantial evidence at trial of defendant's
psychotic state created an obligation to instruct jury on vol-
untariness); *Commonwealth* v. *Cole,* 380 Mass. 30 (1980)
(defendant raised issue of voluntariness at voir dire, objected
on that basis when statements introduced at trial and ad-
duced extensive psychotic evidence of involuntariness, creat-
ing a duty to instruct jury on voluntariness). Thus, if the vol-
untariness of a confession or admission remains a live issue
after evidence of the confession or admission has been
presented to the jury, then the "humane practice" of Massa-
chusetts dictates that the judge instruct the jury that they
may consider the voluntariness of the confession or admission
and reject any statements which they consider involuntary.
See *Commonwealth* v. *Parham, supra* at 841; *Common-
wealth* v. *Vazques, supra* at 102.

We turn first to Benoit's contention that the judge had an
independent obligation to conduct a voir dire on the volunta-
riness of Benoit's statements before they were admitted in
evidence. Because Benoit moved to suppress those statements
before trial, we look to the testimony at the suppression hear-
ing to determine whether voluntariness was raised in that
proceeding. The only witness at the suppression hearing was
the telephone operator who first answered Benoit's call. She
testified that she heard the caller request help, but that he
did not tell her what kind of help he needed. After the opera-
tor put the telephone call through to the police and the police
officer picked up the call, the operator heard the caller say,
"Help me, help me. I killed someone. I killed my wife." She
did not hear the caller crying.[2]

Defense counsel made no mention of the voluntariness of
the statements in his argument on the motion. To the con-
trary, Benoit relied in large part on the argument that the

---

[2]The police officers who went to the apartment were not called as wit-
nesses. Thus the judge did not have evidence before her of Benoit's condi-
tion at the time the police entered the apartment.

statements were inadmissible because they were insufficiently authenticated.[3] This argument is consistent with a theory that Benoit may not have made the statements at all. It does not suggest that Benoit made the statements involuntarily. Thus, the evidence before the judge at the suppression hearing gave no indication whatever that a question existed as to the voluntariness of Benoit's statements. Without evidence of a claim of involuntariness, the judge in these circumstances had no obligation to make a separate inquiry into the issue. *Commonwealth* v. *Brady*, *supra* at 49-50. See *Commonwealth* v. *Harris*, *supra* at 471 n.3. Furthermore, it would be anomalous to require the judge to inquire into the issue "where it might be contrary to the theory and strategy of the defendant." *Commonwealth* v. *Pratt*, 360 Mass. 708, 714 (1972). See also *Commonwealth* v. *Brady*, *supra* at 46.[4]

We next address Benoit's claim that the judge erred by not instructing the jurors to consider whether the statements were voluntary, and to disregard any statement which they found to be involuntary, in accordance with our "humane practice." Benoit argues that although defense counsel failed to request such an instruction, the evidence before the judge was sufficient to raise the issue of voluntariness because testimony indicated that he might have been psychotic, intoxicated, and injured when he made the statements. We do not think that the evidence before the judge was sufficient to raise the issue of voluntariness as a live issue.

Benoit contends that the instant case is controlled by *Commonwealth* v. *Chung*, 378 Mass. 451 (1979), and that the same result should be obtained. The defendant in *Chung* also presented an insanity defense to a charge of murder. We re-

---

[3]This argument is not made on appeal. It is, therefore, deemed waived. See Mass. R. App. P. 16 (a), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *Cundriff*, 382 Mass. 137, 151 n.22, cert. denied, 451 U.S. 973 (1981). Even if the argument had been raised, the testimony would still have been properly admitted. See *Commonwealth* v. *Hartford*, 346 Mass. 482, 488 (1963).

[4]During trial, Benoit objected to the admission of the testimony on the same grounds as raised by his motion to suppress.

versed his conviction because the judge failed to instruct the jury to consider the voluntariness of the defendant's inculpatory statements. The facts and circumstances which we indicated were important in *Chung*, however, are very different from those of the case at bar. See *Chung, supra* at 458 & n.8. In *Chung*, a voir dire was held to determine the admissibility of the defendant's statements in light of allegations of the defendant's insanity. *Commonwealth* v. *Chung, supra* at 457. In the present case, Benoit made no mention of insanity or of lack of voluntariness or of lack of rational intellect at the suppression hearing. In *Chung*, the evidence of insanity at trial consisted of both expert and lay testimony. A psychiatrist testified that Chung suffered from chronic severe schizophrenia, and his evidence was corroborated by a second psychiatrist. The psychiatrists did not specifically address the defendant's mental condition at the time he made the statements. Three other witnesses testified that they had observed Chung engaging in bizarre and irrational behavior before the date of the murder.

In this case, two witnesses testified that they saw Benoit at work during the two days before the murder, and that Benoit's behavior appeared normal. Two other witnesses testified that they held extended telephone conversations with Benoit the evening prior to the murder. They said that they did not hear anything unusual or abnormal in his speech or his conversation. The defense psychiatrist, Dr. Yudowitz, testified that Benoit suffered from chronic schizophrenia, and that he was in a psychotic episode on the night of March 10, 1986. He outlined Benoit's medical history, which showed that Benoit had been treated for a few months for schizophrenia in the early 1970's, and next received mental health care in 1985, when he was treated briefly for anxiety and depression. When asked about Benoit's telephone statements, the psychiatrist indicated that it was his understanding that

Benoit had said, "I *think* I killed my wife."[5] He explained that "in a psychotic state there are lucid intervals where someone has a short awareness of what happened and then they go back in psychosis again."

The psychiatrist who testified for the prosecution testified that the telephone statements show "a capacity to remember what's happened and to grasp the situation and to grasp the wrongfulness of the situation, capacity to appreciate wrongfulness and capacity to conform his conduct to his self-interest, namely to get help at that moment." The judge, therefore, had testimony from both experts which indicated that at the time the statements were made the defendant was probably lucid, knew what he had done, and knew what he was doing. There was affirmative testimony from Benoit's psychiatrist that the statements were made in a lucid interval. The fact that Benoit may have been suffering from a psychotic condition before and after statements were made, does not compel a conclusion that the statements were involuntary.

Where the judge lacked any "substantial evidence of the defendant's insanity at the time he made those statements," *Commonwealth* v. *Vick*, 381 Mass. 43, 46 (1980), there was no live issue before the judge which required the issue to be submitted to the jury. "There is nothing unfair about using the admissions of a psychotic individual where the giving of the admissions is not substantially related to the effects of the psychosis." *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 (1982).

Benoit also points to evidence that he was injured when found by police, and was intoxicated when examined at Cape Cod Hospital. He contends that these factors alone are sufficient to render his telephone statements involuntary. We note at the outset that "[a]lthough alcohol intoxication is an important factor bearing on the issue of voluntariness, intoxica-

---

[5]The telephone operator and the police officer who participated in the conversation both testified at trial that the caller said, "I killed someone. I killed my wife."

tion alone is not sufficient to negate an otherwise voluntary act. *Commonwealth* v. *Lanoue*, 392 Mass. 583, 587 (1984)." *Commonwealth* v. *Parker*, 402 Mass. 333, 341 (1988). See *Commonwealth* v. *Parham, supra* at 838; *Commonwealth* v. *Shipps*, 399 Mass. 820, 826 (1987). Similarly, evidence of injury, without more, is not necessarily sufficient to require a conclusion that a statement was involuntary. See *Commonwealth* v. *Allen, supra* at 458; *Commonwealth* v. *Brady, supra* at 5̉1.

In this case, there is a total absence of evidence as to when Benoit suffered the injuries to his wrists and when he drank the alcohol. The psychiatrists who examined Benoit testified that Benoit has no recollection of the events in question. There is thus no means of determining whether Benoit suffered his injuries before he made the telephone statements, or after he made those statements. Defense counsel also was unable to develop any evidence to show the severity of the wounds or their effect on Benoit's mental condition at the time the telephone call was made. See *Commonwealth* v. *Brady, supra* at 51.

Doctors and police testified that Benoit appeared intoxicated at 6:30 A.M., and appeared still intoxicated at 2:30 P.M. Only one witness offered testimony relating directly to the subject of Benoit's level of intoxication at the time he made the statements. The psychiatrist testifying for the prosecution suggested that at the time he made the telephone call, Benoit's blood alcohol level may not have risen yet to the level it reached when tests were run at the hospital later that morning. Without more, this evidence is not sufficient notice to the judge that the voluntariness of Benoit's statements was a live issue. See *Commonwealth* v. *Parham, supra* at 842; *Commonwealth* v. *Brady, supra* at 55. Further, Benoit did not seriously contest the fact that he killed his wife. Benoit's trial strategy was to portray himself as a kind, loving, and nonabusive husband. He also adduced evidence that he was a law-abiding citizen and that the killing was not consistent with his character. In addition, Benoit offered psychiatric testimony to support his claim of a "psychotic breakdown."

Thus, Benoit's trial tactics did not make voluntariness of the statement a live issue.

Appellate review is not intended "to afford an opportunity, from the vantage point of hindsight, to comb the trial record for interesting questions which could have been, but in fact were not, raised at trial, or to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge" (emphasis deleted). *Commonwealth* v. *Lee*, 383 Mass. 507, 512 (1981), quoting *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978). There was no substantial risk of a miscarriage of justice. See *Commonwealth* v. *Williams*, 399 Mass. 60, 63 (1987).

2. *Dr. Esau's testimony.* Benoit's second claim on appeal is that the admission of testimony from Dr. Esau, who performed a competency exam on March 11, 1986, violated G. L. c. 233, § 20B, and Benoit's right not to incriminate himself under the State Constitution. Benoit raised no objection to Dr. Esau's testimony at trial. Our review again is limited to determining whether there is a substantial likelihood of a miscarriage of justice.

Dr. Esau examined Benoit on March 11, 1986, to determine whether Benoit was sufficiently competent to be sent to jail, or whether he should be sent to Bridgewater State Hospital. Dr. Yudewitz, the psychiatrist testifying for the defense, referred several times to Dr. Esau's evaluation of Benoit's medical condition. He stated that "Dr. Esau found him to be withdrawn, with a severe psycho-motor retardation or slowing down both of the physical self and the psyche. He was then examined and found to be non-competent to stand trial because of his severe mental illness." Shortly afterward, he stated that "every time a physician . . . looks at Mr. Benoit from 1969 to the present . . . everyone agrees that this is a man who is seriously ill, suffering from a very major psychiatric illness, an illness which is quite unpredictable and an illness which certainly doesn't go away." He repeated twice more his assertion that *every* psychiatrist who had examined Benoit agreed that he suffered from schizophrenia, a major mental illness. Finally, Dr. Yudewitz stated that "when you

read Dr. Esau's report at Bridgewater, he says that initially [Benoit] appeared comatose." Dr. Yudewitz stated that he incorporated the reports of previous examinations into his own opinion.

The prosecutor called Dr. Esau as a rebuttal witness. Dr. Esau briefly outlined the circumstances of the examination he performed, and the questions he asked of Benoit. He then stated his diagnosis of Benoit's condition: "I saw no evidence of anything that would suggest to me it was schizophrenia. I was also, through this conversation, reassured that there was nothing major going on in the way of brain disorder." He explained that he was concerned that Benoit might harm himself, and therefore recommended that Benoit be sent to Bridgewater for further evaluation. The prosecutor asked Dr. Esau if Benoit had appeared comatose. Dr. Esau replied, "No. Comatose means unconscious, and he was completely conscious the entire time." This was the full extent of Dr. Esau's testimony.[6]

General Laws c. 233, § 20B (1990 ed.), confers on a patient "the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." The privilege does not apply to communications made pursuant to a court-ordered examination where the patient has been warned in advance that his communications would not be privileged. G. L. c. 233, § 20B (1990 ed.). This privilege does not, however, disqualify a psychotherapist from testifying. *Three Juveniles* v. *Commonwealth*, 390 Mass. 357, 361 (1983). Benoit failed to make any attempt to exercise the statutory privilege at trial. He cannot, therefore, attempt to assert the privilege on appeal. *Adoption of Abigail*, 23 Mass. App. Ct. 191, 198 (1986). See *Petition of the*

---

[6]Dr. Esau did not repeat any statements made by Benoit. Benoit does not contend, nor does the record indicate, that Dr. Esau's testimony exceeded the limitations of G. L. c. 233, § 23B (1990 ed.).

*Dep't of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 969, 970 (1986).

Benoit claims that introduction of Dr. Esau's testimony violated his State constitutional rights. He also claims that he was entitled to, but did not receive, a warning that his statements to Dr. Esau would not be held confidential. See *Commonwealth* v. *Lamb*, 365 Mass. 265 (1974).[7] We must evaluate these claims with careful attention to the precise nature of the testimony that was admitted. Dr. Esau's testimony was not part of the Commonwealth's case-in-chief. Dr. Yudewitz, testifying for the defense, stated that Dr. Esau had diagnosed Benoit as schizophrenic, and had described Benoit as comatose. Dr. Esau's brief testimony was limited to statements that he had examined Benoit and had not seen any signs of schizophrenia, and that Benoit was not comatose. When Benoit himself introduced in evidence the details of Dr. Esau's diagnosis and observations, he opened to the State the opportunity to rebut evidence on those narrow topics. See *Commonwealth* v. *Clancy*, 402 Mass. 664, 668-669 (1988); *Commonwealth* v. *Callahan*, 386 Mass. 784, 789 (1982); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 766 (1977). Dr. Esau's testimony did not create a substantial likelihood of a miscarriage of justice.

Finally, Benoit argues that his trial counsel's failure to object to Dr. Esau's testimony constituted ineffective assistance of counsel. This argument can succeed only if defense counsel's performance fell measurably below that of an ordinary, fallible lawyer, and if his conduct deprived the defendant of an otherwise available, substantial ground of defense. *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Because we conclude that Dr. Yudewitz's testimony concerning Dr. Esau's diagnosis and observations opened to the State the op-

---

[7]The record is not clear what Dr. Esau specifically told Benoit. Dr. Esau said that he explained to Benoit "why I [Dr. Esau] was there, what I [Dr. Esau] needed from him, what the possible outcome might be of our conversation." Thus, Benoit's claim he received no warnings from Dr. Esau is not established on this record.

portunity to rebut that testimony, trial counsel's failure to object to the testimony was not ineffective assistance of counsel.

3. *Dr. Suarez's testimony.* Benoit objected to the testimony of Dr. Suarez, the pathologist, claiming that Dr. Suarez had not performed the autopsy and had no independent recollection of the details of the autopsy. The judge held a voir dire and determined that Dr. Suarez was competent to testify as to the autopsy results.

The qualifications and competence of a witness to testify are in the discretion of the trial judge. *Commonwealth* v. *Tarver*, 369 Mass. 302, 310 (1975). Dr. Suarez stated at the voir dire that while another physician had actually performed the autopsy, Dr. Suarez was present and had double-checked all the significant findings. His memory of the autopsy was the same as it would be if he had performed it himself. He agreed with the conclusions reached by the doctor who performed the autopsy. The judge was correct that Dr. Suarez was competent to testify about the autopsy.

4. *General Laws c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and we conclude that justice does not require us to reduce the verdict to a lesser degree of guilt or to order a new trial.

*Judgment affirmed.*