COMMONWEALTH *vs.* GAIL HALL.

No. 96-P-0805.

Suffolk. November 5, 1997. - July 1, 1998.

Present: WARNER, C.J., GILLERMAN, & FLANNERY, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Admissions and confes-
sions, Voluntariness of statement. *Intoxication. Malice. Insanity.
Constitutional Law,* Admissions and confessions. *Evidence,* Admissions
and confessions.

At a murder trial, the judge's failure to instruct the jury that they could
consider the effects of the defendant's intoxication in their determination
of the third prong of malice did not constitute reversible error where, in
light of the evidence presented at trial, a reasonable jury would not have
concluded that the defendant's intoxication affected her knowledge of the
circumstances of the homicide. [150-151]
At a murder trial, the judge's use of "frame of mind" language in her instruc-
tion defining malice did not create a substantial risk of a miscarriage of
justice, where the judge's instructions otherwise adequately conveyed the
meaning of malice to the jury. [151-152]
At a murder trial, the judge properly refused to instruct the jury on lack of
criminal responsibility or involuntary manslaughter, as requested by the
defendant, where the evidence was insufficient to warrant such instructions
[152-153, 154-155], and the judge's instructions on voluntary manslaughter,
which failed to restate the Commonwealth's burden of proof, were
otherwise constitutionally sufficient [153-154].
The denial of a criminal defendant's motion to suppress statements given to
the police did not constitute reversible error, where there was no evidence
that the statements were elicited in violation of the defendant's *Miranda*
rights [155-156], and where the record of the hearing on the motion
indicated that defense counsel had abandoned his attempt to have the state-
ments suppressed as involuntarily made [156-158].

INDICTMENT found and returned in the Superior Court Depart-
ment on March 23, 1993.

A pretrial motion to suppress evidence was heard by *Suzanne
DelVecchio,* J., and the case was tried before her.

*Donald A. Harwood* for the defendant.

*Joseph M. Makalusky,* Assistant District Attorney, for the Commonwealth.

WARNER, C.J. The defendant was convicted of second degree murder in the stabbing death of Thomas O'Leary. She contends on appeal that the trial judge committed multiple errors: that she erroneously instructed the jury on malice and on voluntary manslaughter; that she should have instructed the jury on lack of criminal responsibility and on involuntary manslaughter; and that she should have suppressed certain of the defendant's statements. We affirm the conviction.[1]

We summarize the relevant evidence of the parties in order to frame more distinctly the appellate issues.

*The Commonwealth's case.* On January 31, 1993, shortly after 6 P.M., two police officers were called to the building where O'Leary and the defendant shared an apartment. A fourteen year old boy met them there and told them that the defendant had said, "Call the police. I just killed my husband." The defendant was standing in the hallway, crying and covered with blood, confused and upset. She smelled strongly of alcohol, and both officers thought she was intoxicated. According to one of the officers, however, she was steady on her feet, her speech was not slurred, and she was coherent.[2] She told him that she had just stabbed or killed O'Leary.

An officer entered the apartment and found O'Leary slumped on the living room couch, bleeding. A nine and one-half inch long steak knife lay near him. He had been stabbed fourteen times. Eight of the wounds were major. They included a lethal wound to the heart. The apartment was not in disarray, and there did not appear to have been a struggle. Blood was found in the bathroom sink and on a light switch, but most was limited to the couch.

A police officer who accompanied the defendant to the police station testified (as did other police officers who encountered her there) that she was confused and seemed highly intoxicated. At the station, she kept repeating that she had done "something really, really bad." The booking officer believed that she was intoxicated because she smelled strongly of alcohol, but

---

[1]Our consideration of this appeal has not been aided by both parties' numerous requests for enlargements of time for filing briefs. We note that the delays occurred before the case was reassigned to the assistant district attorney who argued the appeal before this court.

[2]The other officer testified that the defendant's speech was slurred.

concluded that she "understood what was going on." She answered questions appropriately, did not slur her words, and stood without swaying. Another officer testified that she was babbling and incoherent, appeared quite drunk, told him that she had been drinking, and kept repeating, "He stabbed me and I stabbed him. I think I killed him."

At trial, the State medical examiner testified that the victim's blood alcohol content had been .34 and that this level, the result of having imbibed approximately seventeen drinks, would have rendered him comatose or nearly so. Based on O'Leary's high blood alcohol level and on the relative bloodlessness of the crime scene, the medical examiner concluded that O'Leary had been comatose or partially comatose when he was stabbed.

*The defendant's case.* The defendant contended that she had been defending herself against an abusive batterer. She testified that on the day of the stabbing, she and O'Leary went to a restaurant around noon, and remained at the bar until 5:00 or 5:30 in the afternoon. She had one full drink and a sip of another,[3] while O'Leary drank continuously. The walk home, through cold and snowy weather, took about ten minutes.

As they entered their apartment, O'Leary accused the defendant of having looked at another man across the bar. She replied that he was imagining things, and he grabbed her arms and slammed her against the wall three times, hitting her head each time. When her knees buckled, he kicked her in the left leg with steel-toed boots. She fell, bumping against a small portable refrigerator. It fell on her, she pushed it off herself, and got up.

O'Leary continued to berate her, and, in the living room, struck her in the face with the back of his hand. She fell onto the coffee table, then got up and "put things back together." O'Leary went into the kitchen and returned holding something shiny. The defendant thought it was a butter knife and threatened to call the police. Eyes bulging and teeth clenched, O'Leary yelled that she would not do that. She tried to run past him and out of the apartment, but he grabbed her arm and slashed at her with the knife, calling her a "whore" and a "slut." Fearing for her life, she pulled free, and attempted to grab the knife. From that point on, she remembered hitting O'Leary in the chest with

---

[3] A psychiatrist for the defense testified that the defendant had told her she had had two full drinks and sips out of two others.

her fist, but could not remember stabbing him. She remembered only falling on top of him onto the sofa, then getting up and running out the door.

In the hallway, she banged on neighbors' doors for help, yelling, "Policia, Policia," because they did not understand English. Eventually, a boy who lived on the first floor called 911. She could not remember having told the police at the scene that she had stabbed O'Leary. She contended that she had not been intoxicated, but had been frightened, both immediately before the stabbing and afterwards.

The defendant testified further about her abusive relationship with the six foot tall, 180 pound, alcoholic ex-Marine who was generally unemployed and whom she supported financially during the six years they lived together.[4] She described her fear of O'Leary and his constant verbal and physical abuse, which included hitting, spitting, throwing things at her and an attempt to choke her. She brought charges of assault and battery and of assault and battery with a dangerous weapon against him, but they were dropped, apparently with her acquiescence. She also obtained a restraining order, effective for one year, but permitted him to return after two days when he begged and cried. She left him several times, but agreed to reunite when he cried and promised to reform. Eventually, O'Leary remained home drinking every day, vomiting into a bucket which he made the defendant clean when she returned home from work.

Dr. Prudence Baxter, a psychiatrist who had examined the defendant, testified about battered woman's syndrome.[5] She described it as "a constellation" of behaviors and emotions found in relationships characterized by physical and psychological abuse, but not itself a diagnosis or an illness. The victim of battered woman's syndrome, Dr. Baxter testified, becomes anxious, depressed, humiliated, and fearful, and eventually focuses on mollifying the abuser. As a result, she may become

[4]The record leaves Hall's and O'Leary's marital status unclear.

[5]See *Commonwealth* v. *Rodriquez*, 418 Mass. 1, 7 (1994), discussing the admissibility of expert testimony regarding battered woman's syndrome in cases where self-defense is in issue and where there is evidence that the victim has engaged in a pattern of abuse of the defendant. See also *Commonwealth* v. *Moore*, 25 Mass. App. Ct. 63, 66 (1987) (such testimony has been "admitted to aid the jury in evaluating the reasonableness of the defendant's apprehension of serious, imminent bodily harm and to explain why the defendant remained in the relationship or the home after suffering beatings").

"hyperaroused," and her perception of the threat inherent in a particular situation may be increased. Dr. Baxter concluded that the defendant was a victim of battered woman's syndrome and that the syndrome contributed to her belief that she was defending herself against the danger of death or serious injury when she killed O'Leary.

Dr. Baxter further testified that the defendant's inability to recall the stabbing was consistent with "dissociative amnesia," a condition which prevents an individual who has been involved in an acutely traumatic experience from remembering aspects of that event. She noted that hyperarousal and the inability to recall aspects of a traumatic event both are symptomatic of posttraumatic stress disorder, a psychiatric disorder recognized by the American Psychiatric Association. She concluded, however, that the defendant did not meet the full criteria of this diagnosis.

Finally, the defendant presented medical experts who testified, contrary to the medical examiner's opinion, that an alcoholic, having developed a tolerance to large quantities of alcohol, would not necessarily be comatose or semicomatose even with a blood alcohol level as high as the victim's. In fact, they testified, such a person could be capable of physical violence.

1. *The failure to instruct on intoxication regarding the third prong of malice.* The trial judge instructed the jury that they could consider evidence of the defendant's intoxication on whether she formed the intent to kill or cause grievous bodily harm, the state of mind required for the first two methods of finding malice aforethought.[6] She refused, however, over the defendant's objection, to instruct the jury that they could consider the effects of intoxication on whether the defendant

---

[6] A jury must find that a defendant possessed malice aforethought in order to convict her of murder. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). "Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm. However, proof of such an intent is not required because malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act" (citations omitted). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). This third method of proving malice "is sometimes referred to as the third prong of malice." *Commonwealth* v. *Moore*, 408 Mass. 117, 134 n.9 (1990).

had sufficient knowledge of the circumstances in which she acted to realize that there was a plain and strong likelihood that her actions would cause death, the requisite state of mind for the third method of proving malice. This was error. "[E]vidence of a defendant's voluntary intoxication is a factor for the jury to consider whenever the Commonwealth bears the burden of establishing the knowledge of the defendant beyond a reasonable doubt." *Commonwealth* v. *Sama*, 411 Mass. 293, 299 (1991).

In this case, however, the omission of the instruction was not reversible error. "[E]vidence of intoxication is relevant only if it concerns the defendant's knowledge of the circumstances of the killing; where there is no evidence that due to intoxication the defendant did not know the circumstances of the killing, the omission of a *Sama* instruction, although error, would not constitute prejudicial error." *Commonwealth* v. *Sullivan*, 425 Mass. 449, 453 (1997), cert. denied, 522 U.S. 1060 (1998), citing *Commonwealth* v. *Sanna*, 424 Mass. 92, 101-102 (1997). See *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992).

As in *Commonwealth* v. *Sullivan*, 425 Mass. at 452 & 453 n.5, there was evidence of the defendant's drinking, but also testimony showing her detailed knowledge of the circumstances surrounding the killing. She herself insisted that she had not been intoxicated. She described the walk home from the restaurant and provided details of the argument and the fighting, culminating in her grabbing for the knife and hitting O'Leary. Immediately after the stabbing, she had the presence of mind to translate into Spanish her request to neighbors to call the police.

In light of this evidence, a reasonable jury could not have concluded that the defendant's intoxication was so debilitating that it prevented her from knowing what she was doing as she repeatedly stabbed O'Leary. See *id.* at 453-454. See also *Commonwealth* v. *Murphy*, 426 Mass. 395, 400 n.3 (1998) (the defendant's detailed recall of events the night of the murder, before and after the killing, "made clear that he was aware of his circumstances"). Compare *Commonwealth* v. *Sama*, 411 Mass. at 298-299; *Commonwealth* v. *McLean*, 32 Mass. App. Ct. 978, 979 (1992) (in both cases, there was evidence of intoxication which, if believed, could have led the jury to have reasonable doubt concerning the defendant's knowledge of the circumstances of the killings).

2. *The definition of malice.* The malice instruction referred to

the three prongs of malice, *Commonwealth* v. *Grey*, 399 Mass. at 470 n.1, but also included a definition of malice subsequently disapproved. The judge charged that "[i]f the circumstances attending a killing disclose that the death follows from a purposeful, selfish, wanton motive, then there is malice aforethought." The defendant claims that this language was particularly prejudicial because the prosecutor argued that the defendant stabbed the victim out of rage and resentment, not out of self-defense or fear.

In *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), the Supreme Judicial Court stated that "frame of mind" language is "not helpful and ought in the future to be omitted." However, malice instructions which include the three-prong definition along with the disapproved language "adequately convey the meaning of malice to the jury." *Commonwealth* v. *Murphy*, 426 Mass. 395, 401 (1998), and cases cited. See *Commonwealth* v. *Torres*, 420 Mass. 479, 486-487 (1995) ("frame of mind" language was not reversible error despite the defendant's contention that it undercut a key defense — that he shot the victim in a state of rage arising from reasonable provocation). As in *Commonwealth* v. *Eagles*, 419 Mass. at 837, the unobjected to "frame of mind" language created no substantial risk of a miscarriage of justice.

3. *Refusal to instruct on lack of criminal responsibility.* The defendant contends that the judge should have granted her request for an instruction on lack of criminal responsibility. She made a timely objection.

" 'An insanity defense may be raised properly by the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime].' *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246-247 (1977). Expert testimony is not required to raise the issue." *Commonwealth* v. *Mills*, 400 Mass. 626, 627 (1987). See *Commonwealth* v. *Guadalupe*, 23 Mass. App. Ct. 97, 100-101 (1986). "Lack of criminal responsibility requires the existence of a mental disease or defect, which causes the defendant to lack the substantial capacity either to appreciate the wrongfulness of his or her acts, or to conform his or her conduct to the requirements of the law. *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). Once the evidence is sufficient to raise the issue of insanity and an instruction is requested, the refusal of that request is reversible error. *Commonwealth* v. *Monico*, 396 Mass.

793, 803 (1986)." *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 515 (1997).

The defendant contends that the following evidence raised the issue of insanity: Dr. Baxter's testimony that the defendant may have had an increased perception of the threat she faced because she was a victim of battered woman's syndrome; Dr. Baxter's testimony that the defendant's inability to remember the stabbing may have resulted from "dissociative amnesia"; and the police testimony concerning the defendant's distraught and confused condition after the stabbing.

There was nothing in Dr. Baxter's testimony to indicate that the defendant suffered from a condition which either prevented her from understanding the wrongfulness of her behavior or prevented her from controlling her actions. Dr. Baxter specifically stated that battered woman's syndrome was not a diagnosis or an illness. In fact, her testimony concerning battered woman's syndrome was used during closing argument to buttress the defense theory that the defendant had acted reasonably in self-defense. Dr. Baxter testified about "dissociative amnesia" as a means of explaining the defendant's inability to remember the stabbing; the testimony made no reference to the defendant's ability to understand or to control her behavior. The police testimony concerning the defendant's condition focused on her intoxication, and was contradicted by her own testimony. None of this evidence, alone or taken together, could have left the jury with a reasonable doubt about the defendant's criminal responsibility under the *McHoul* test. Moreover, the defendant herself testified to her rational behavior and detailed memory of events prior to the stabbing as well as her successful efforts to get help immediately afterward. Finally, her statement to the police that she had done something "bad" showed that she understood the wrongfulness of her actions.

The judge properly refused to give the requested instruction. Compare *Commonwealth* v. *McInerney*, 373 Mass. 136, 152-153 (1977); *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979); *Commonwealth* v. *Seabrooks*, 425 Mass. at 515-517 (evidence was insufficient to warrant an insanity instruction), with *Commonwealth* v. *Laliberty*, 373 Mass. at 246-247; *Commonwealth* v. *Monico*, 396 Mass. at 797-803; *Commonwealth* v. *Mills*, 400 Mass. at 628-632 (1987) (evidence was sufficient to warrant the instruction).

4. *The instruction on voluntary manslaughter.* The defendant

asserts that the instruction on voluntary manslaughter created a substantial risk of a miscarriage of justice because the judge failed to instruct that the Commonwealth bore the burden of proving the absence of reasonable provocation beyond a reasonable doubt. While it is "the better practice" to restate the Commonwealth's burden of proof, so long as the judge "adequately define[s] provocation and explain[s] that it negates a finding of malice," the charge is constitutionally sufficient. *Commonwealth v. Doucette*, 391 Mass. 443, 452-453 (1984). See *Commonwealth* v. *McLeod*, 394 Mass. 727, 739-740, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). Here, the judge repeatedly placed the burden of proof beyond a reasonable doubt on the Commonwealth, reiterating that this burden included proving all the elements of voluntary manslaughter as well as the absence of self-defense. She defined provocation, and instructed that adequate provocation negates a finding of malice. The holding "in *Commonwealth* v. *Doucette*, 391 Mass. 443 (1984), fully disposes of the defendant's argument." *Commonwealth* v. *Todd*, 408 Mass. 724, 727 (1990). There was no substantial risk of a miscarriage of justice.

5. *Involuntary manslaughter.* The defendant argues that the trial judge committed reversible error by failing to instruct the jury on involuntary manslaughter based on mental impairment resulting from intoxication. The defendant never requested an involuntary manslaughter instruction based on intoxication, but rather requested a similar instruction based on mental disease or defect. In any event, the evidence in this case did not warrant such an instruction.

The defendant essentially argues that the jury could have found her guilty of involuntary manslaughter because of her diminished capacity induced by intoxication.[7] However, "there is no 'diminished capacity' defense in this Commonwealth." *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995). " 'The traditional elements of involuntary manslaughter must be shown by evidence that the jury might believe before an instruction on involuntary manslaughter is required.' " *Commonwealth* v. *Caines*, 41 Mass. App. Ct. 812, 818 (1996), quoting from *Commonwealth* v. *Sires*, 413 Mass. at 302-303. An involuntary manslaughter conviction may be based on either of two theories: "an unintentional killing resulting from 'a battery

---

[7]This position, of course, contradicts the defendant's assertion at trial that she had not been intoxicated.

not amounting to a felony which the defendant knew or should have known endangered human life,' " or " 'wanton and reckless conduct causing death.' " *Commonwealth* v. *Sanna*, 424 Mass. at 105, quoting from *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994). Only the latter theory would be potentially applicable in this case. If the evidence permits a finding of manslaughter rather than murder, a manslaughter instruction must be given. *Commonwealth* v. *Sanna*, 424 Mass. at 105.

The risk of physical harm "that will satisfy the standard for wanton and reckless conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.' " *Ibid.*, quoting from *Commonwealth* v. *Sires*, 413 Mass. at 303-304 n.14. "When it is obvious, however, that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." *Commonwealth* v. *Pierce*, 419 Mass. at 33. See *Commonwealth* v. *Jenks*, 426 Mass. 582, 586 (1998). The fourteen stab wounds the defendant inflicted on O'Leary clearly "created a plain and strong likelihood" of death. There was no error.

6. *Denial of the defendant's motion to suppress statements.* The defendant moved to suppress statements she made to the police both before and after her arrest, contending that they were elicited in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and that she had been intoxicated and hysterical at the time. The trial judge held an evidentiary hearing on that motion and also on the defendant's motion to suppress physical evidence, the latter not at issue in this appeal, and denied both motions.[8] On appeal, the defendant argues that the admission of inculpatory statements violated her rights under *Miranda* and also violated due process because the Commonwealth never proved that the statements were voluntary. See *Commonwealth* v. *Brady*, 380 Mass. 44, 48 (1980) (due process is violated when a conviction is based on an involuntary confession).

The police officers who had either been called to the defendant's apartment after the crime or had encountered her when she was brought to the police station testified at the motion hearing. Their testimony was consistent with the police testimony elicited at trial.

---

[8]The judge did submit the issue of voluntariness to the jury as part of her final charge. See *Commonwealth* v. *Harris*, 371 Mass. 462, 469-472 (1976), concerning the Massachusetts "humane practice."

a. *Miranda.* "*Miranda* warnings are required only when a person in custody is subjected to either express questioning or its functional equivalent." *Commonwealth v. Sheriff*, 425 Mass. 186, 197 (1997). The police officers to whom the defendant made inculpatory statements testified at the hearing that they did not question her and that her statements had been spontaneous. One officer testified that orders were given at the police station not to question the defendant. There was no indication that the defendant's remarks to the police were responses to questions, either direct or implied. Thus, there was no evidence that her rights under *Miranda* were violated.

b. *Voluntariness.* The Commonwealth concedes that the defendant's motion, together with the evidence regarding intoxication elicited at the hearing, raised the issue of the voluntariness of her statements. Once the issue is raised, the judge must determine whether the confession or admission was voluntarily made before the jury hears it. *Commonwealth v. Benoit*, 410 Mass. 506, 511 (1991). If the judge determines that the statement was voluntary, that conclusion " 'must appear from the record with unmistakable clarity.' " *Commonwealth v. Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982), quoting from *Sims v. Georgia*, 385 U.S. 538, 544 (1967). *Commonwealth v. Ward*, 426 Mass. 290, 296 (1997).

Here, the judge simply denied the motion to suppress, making no findings. In certain situations, we can infer from the denial that the judge found the defendant's statements to be voluntary. In *Commonwealth v. Brady*, 380 Mass. at 52, for example, where "the evidence presented at the voir dire [was] not conflicting and [did] not raise any question of custodial coercion, the judge's decision to admit the defendant's statements [made] his conclusions as to voluntariness 'clearly evident from the record.' "[9]

In this case, the judge's intentions were more obscure. At the close of testimony, the judge asked defense counsel whether he "really" wanted her to suppress the statement, "He stabbed me first, and then I took the knife."[10] The defendant's case resting on self-defense, counsel answered in the negative, and the judge deemed the statement admissible "by agreement of counsel."

[9]The court in *Brady* "in no way condone[d] the judge's failure to make findings." *Commonwealth v. Brady*, 380 Mass. at 52.

[10]According to the witness's testimony, the statement was actually, "He stabbed me and I stabbed him."

Defense counsel further agreed to the admission of the fourteen year old boy's statement that the defendant had told him, "I just killed my husband upstairs." The judge then inquired twice whether the defense wanted anything suppressed. Counsel responded only that certain photographs of the crime scene should be excluded. After a short discussion of other matters, the judge concluded the hearing, stating, "That's all we have left, would be the photographs. I think the rest would be coming in. *You don't want them out.*" (Emphasis supplied). Defense counsel responded, "Thank you." The next day, immediately before trial, the judge denied the suppression motions. Defense counsel asked her to "save [his] rights . . . on the motions," and she answered, "Yes."

It is not clear whether the judge actually ruled on the voluntariness of the statements or whether she refrained from doing so because she believed that the defense had withdrawn the issue. What is clear, however, is that defense counsel specifically asked her to admit the statement, "he stabbed me and I stabbed him," and that this statement was important to the self-defense strategy.[11] It would be "anomalous to require the judge to inquire into [the voluntariness of this statement] 'where it might be contrary to the theory and strategy of the defendant.' *Commonwealth* v. *Pratt*, 360 Mass. 708, 714 (1972)." *Commonwealth* v. *Benoit*, 410 Mass. at 513 (ruling that judge did not err in failing to rule on the voluntariness of the defendant's statements because the issue was not presented to the judge). "When a defendant, acting through competent counsel, puts particular evidence in issue, he may not effectively argue on appeal that his own trial strategy denied him his constitutional rights." *Commonwealth* v. *Williams*, 379 Mass. 600, 606 (1980) (ruling that the defendant's own use of a statement obviated any need for the judge to hold a hearing on its voluntariness). See *Commonwealth* v. *Brady*, 380 Mass. at 49 (the judge did not err in failing to submit the issue of voluntariness to the jury, since the defendant abandoned the issue).

Defense counsel's responses to the judge at the end of the hearing indicated that he had abandoned his attempt to have the defendant's other inculpatory statements suppressed. These

---

[11]In his opening statement, defense counsel asserted that the case was "all about [] self-defense." In his closing, he asked rhetorically, "Was she lying when she . . . held her hand out to him and said, 'He stabbed me, and I took the knife, and I stabbed him?' "

included her admissions that she had "stabbed her husband" and had "done something bad." Even if the refusal to suppress these statements had been error, there was no harm to the defendant. The defendant's admission that she had done the stabbing was merely cumulative of statements that defense counsel specifically agreed to have admitted. Moreover, there was no issue at trial as to whether the defendant had stabbed O'Leary, only whether she had acted in self-defense.

The defendant's statement that she had "done something bad," however, indicated that she understood the wrongfulness of her actions. Thus it undercut her argument that she lacked criminal responsibility under *Commonwealth* v. *McHoul*, 352 Mass. at 548-555. Nevertheless, because she never produced sufficient evidence to raise the issue of insanity, see part 3, *supra*, its admission did not harm her case. See *Commonwealth* v. *Berrio*, 407 Mass. 37, 43 (1990) (the defendant's statements, even if erroneously admitted, added nothing harmful to properly admitted testimony).

The denial of the defendant's motion to suppress statements did not constitute reversible error.

*Judgment affirmed.*